**HOME BOX OFFICE, INC., Plaintiff,**

v.

**ADVANCED CONSUMER TECHNOLOGY, MOVIE ANTENNA, INC., Richard S. Kalin, Defendants.**

**No. 81 Civ. 559.**

United States District Court,
S.D. New York.

Nov. 4, 1981.

Warshavsky, Hoffman & Cohen, New York City, for plaintiff; David W. Cohen, New York City, of counsel.

Nitkin, Alkalay, Handler & Robbins, New York City, for defendants; Jon Paul Robbins, New York City, of counsel.

SOFAER, District Judge:

The scheme sought to be enjoined in this litigation is a straightforward attempt by defendants to exploit a television service offered by plaintiff Home Box Office, Inc. ("HBO") to paying subscribers. Before being temporarily restrained on January 29, 1981, defendants manufactured and sold equipment that permitted purchasers to intercept HBO programs and thus avoid the need to pay HBO's subscription fee. Defendant Advanced Consumer Technology ("ACT") manufactured the equipment, which was distributed by defendants Movie Antenna, Inc. ("MAI") and MAI's president, Richard Kalin, among others. Plaintiff now seeks permanently to enjoin defendants from manufacturing, selling, or advertising this equipment. For the reasons set forth in this opinion, and on the basis of the following findings, an injunction is granted.

## I. *Factual Background*

HBO transmits a variety of motion pictures, sports events, and other entertainment programs, generally unavailable on commercial television. It owns and has registered the copyrights to many of the programs it provides. HBO does not transmit the programs directly to its ultimate customers; rather, the programs are sent to affiliates who sell HBO service on a retail basis, and who pay to HBO a large portion of the revenues they collect. HBO programs do not contain commercial advertisements; its sole source of revenue from its television business are the payments it receives from affiliates.

In the New York City area, HBO transmits its programs to affiliates in two ways: by underground cable and through the air via microwave signal. Only the latter method of transmission is at issue in this litigation. To provide microwave service, HBO leases time on transmitters owned by the Microband Corporation of America ("Microband"), a common carrier licensed by the Federal Communications Commission ("FCC") to provide a service called Multipoint Distribution Service ("MDS"). Microband's MDS operates on a portion of the radio band, 2150–2162 megahertz ("MHz"), that has been allocated by the FCC specifically for "point-to-point" microwave transmission. Microband provides access to its MDS system on a first-come, first-served basis, pursuant to a tariff that it files with the FCC. Only one entity may lease an MDS channel at any given time and, in New York City, HBO is Microband's only subscriber.

The microwave signal transmitted by HBO cannot be received on conventional television sets without supplemental equipment. To receive HBO programming, one must have a special antenna, designed to pick up the relatively high-frequency MDS signal, and a down-converter that transforms the signal to a frequency that conventional television sets are able to receive.[1] The antenna and down-converter are supplied by HBO's affiliates to customers who pay a monthly subscription charge. The affiliate installs an antenna and down-converter on the roof of each house or apartment building within range of the MDS signal, and in which HBO service is desired. The signal is received by the antenna, down-converted, and then transferred to individual television sets through wire cables. Many HBO affiliates also provide their customers with other non-commercial television services, most of which are transmitted via cable rather than by radio signal.

Defendant ACT manufactures an antenna and down-converter that enables purchasers to receive MDS on conventional television sets. ACT had been selling this equipment to outlets and customers throughout the nation, until it was forced

---

1. Conventional sets are designed to receive Very High Frequency ("VHF") signals in the frequency ranges 54–72, 76–88, and 174–216 MHz. All sets manufactured in recent years must also be capable of receiving Ultra High Frequency ("UHF") signals in the range 470–806 MHz. PX 5.

to stop doing so in California by statute, and in all other states by this Court's temporary injunction. Defendant MAI was incorporated by defendant Richard Kalin to sell these products to the general public in the New York City area. The equipment is technologically simple, and can be installed by the purchaser. In some cases, a customer must purchase an extra power source to transmit the signal from the antenna and down-converter to his television set. In the New York City area, the ACT equipment can only be used to receive HBO programming. If another entity leased MDS time from Microband, however, its signal could be received by anyone who owned the ACT product.

HBO, or any other MDS user, can provide some protection from unauthorized reception by arranging with Microband to scramble its MDS signal. A scrambled signal is received, by those who possess the appropriate microwave equipment, in unintelligible form. To see the proper image, the receiving party must have a descrambler. HBO thus far has chosen not to scramble its signal.

ACT also sells a device known as an Earth Station, which is a large antenna capable of receiving signals transmitted by satellites, amplifying them, and converting the signals to a frequency that can be tuned by conventional television sets. Earth Stations are apparently capable of receiving all or most of the signals that are now transmitted by satellite, including a large number of television broadcasts and private telephone communications. Transcript ("Tr.") 84–85 (Testimony of Mark Elden). Many of these communications are protected by scrambling, but descramblers may also be used in conjunction with Earth Stations.[2]

HBO alleges that defendants' activities violate section 605 of the Communications Act of 1934, federal copyright and trademark laws, and various state laws. Defendants' activities do in fact violate section 605, so no need exists to reach and decide plaintiff's other claims.[3]

## II. Section 605 of the Communications Act of 1934

Section 605 of the Communications Act of 1934 provides in pertinent part that no unauthorized person "shall receive or assist in receiving any interstate or foreign communications . . . for his own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605. Defendants have undoubtedly assisted others in receiving interstate communications, for the purpose of profiting on sales of equipment that enables nonsubscribers to obtain HBO services for

---

**2.** Satellites also play an important role in the process by which HBO programs are transmitted to Microband for transmission to the public via HBO's affiliates. HBO transmits its programs from a central programming location to satellite which in turn transmits the program to a receiving location at or near the location from which the programs are transmitted to the public. In New York City, the receiving station is located on 23rd Street and the signal is transmitted from that point to Microband's antenna atop the Empire State Building through the use of underground telephone cables. An individual who possesses an adequate earth station in New York City would therefore be able to receive HBO programs by intercepting the signal before it is sent to HBO affiliates via MDS.

**3.** Defendants have challenged plaintiff's right to enforce section 605 in a private action. Recent decisions of the Supreme Court indicate increased reluctance to imply private causes of action in a variety of contexts. See, e.g., Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) (no implied right of action under § 206 of the Investment Advisers Act of 1940); Touche Ross & Co. v. Redington, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (no implied right of action order § 17(a) of the Securities Exchange Act of 1934). The Second Circuit specifically has held, however, that a private cause of action exists. Reitmeister v. Reitmeister, 162 F.2d 691 (2d Cir. 1947). This decision has been upheld repeatedly in this Circuit, and the Supreme Court has declined opportunities to review the issue. Guido v. City of Schenectady, 404 F.2d 728, 731 (2d Cir. 1968), cert. denied, 395 U.S. 962, 89 S.Ct. 2099, 23 L.Ed.2d 748; Pugach v. Dollinger, 277 F.2d 739 (2d Cir. 1960), aff'd per curiam on other grounds, 365 U.S. 458, 81 S.Ct. 650, 5 L.Ed.2d 678 (1961). A district court should, in these circumstances, abide by controlling precedent, particularly since Congress has had ample opportunity to make clear any contrary intention. Compare Touche Ross, supra, 442 U.S. at 579, 99 S.Ct. at 2490.

which they have not paid. The statute further provides, however, that its prohibitions "shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public...." *Id.* Defendants claim that this proviso removes their conduct from section 605's prohibition, because HBO's transmissions are broadcast for general consumption.

The problems posed by this litigation stem from the recent revolution in microwave technology that enables consumers willing to make a modest investment in simple equipment to receive MDS transmissions that previously were available only to authorized persons or at substantial cost. The FCC has considered many of the problems associated with these technological advances and has preliminarily concluded that the unauthorized interception of MDS broadcasts violates section 605. FCC, Public Notice, Unauthorized Interception and Use of Multipoint Distribution Service (MDS) Transmissions (Jan. 24, 1979). Courts have nevertheless felt free to construe section 605 independently of the FCC's judgment, and while most decisions have been consistent with the FCC's position, *National Subscription Television v. S & H TV,* 644 F.2d 820 (9th Cir. 1981), *rev'g* No. 80–829 (C.D. Cal. Aug. 4, 1980); *Chartwell Communications Group v. Westbrook,* 637 F.2d 459 (6th Cir. 1980); *Home Box Office, Inc. v. Pay TV of Greater New York, Inc.,* 467 F.Supp. 525 (E.D.N.Y.1979), there is some authority to the contrary, *Orth-O-Vision, Inc. v. Home Box Office, Inc.,* 474 F.Supp. 672 (S.D.N.Y.1979) (dictum).

Defendants contend that HBO transmissions are "intended for the use of the general public," and therefore fall outside the reach of section 605. *Memorandum in Opposition to Application for Injunction* at 6. HBO's microwave broadcasts should be viewed as intended for the general public, defendants contend, because its signal can be received by equipment widely available to, and within the means of, the general public, and HBO has taken no steps to protect its signal from unauthorized reception; because HBO's programs are essentially indistinguishable from commercial television programs; and because HBO desires to reach as wide an audience as possible.

To determine whether HBO programs are intended for the general public requires more than a literal reading of the statute. The language of section 605 is the modern embodiment of a provision that has been a part of communications law for almost seventy years. Any attempt to construe it requires one to examine the statute's origins, the legislative intent behind its enactment, and its regulatory history. These materials demonstrate that the considerations identified by defendants, though weighty, are insufficient to permit an interpretation that would protect their conduct in this case. In sum, these sources show that section 605 and its predecessors were designed, and have been used, to protect communications access to which the sender intends to restrict and is authorized by the FCC to restrict, even though unauthorized recipients could readily obtain the technological capacity to intercept the signal involved, and irrespective of the content of the transmission.

A. *Legislative History*

Section 605 of the Communications Act of 1934 originated as Regulation 19 to Section 4 of the Radio Act of 1912, Pub.L. No. 62–264 § 4, reg. 19, 37 Stat. 302. The 1912 Act was Congress's first major attempt to regulate the then rapidly expanding radio communications industry. The statute contained several provisions that are pertinent to this litigation. First, the statute set a pattern for future regulations by allocating radio frequencies for specific purposes, such as for use by the federal government, ships and coastal stations, and amateurs. *Id.* § 4. Later, under subsequent acts and regulations, nearly every frequency would be allocated for a specific purpose. Second, the 1912 Act required that all radio operators be licensed by the Department of Com-

merce and Labor, *id.* § 1, and placed restrictions on the nature and character of permissible radio signals in order to prevent or minimize interference with other radio signals, *id.* § 4. These provisions were also forerunners to those in the modern regulatory structure, through which the FCC controls nearly every aspect of the communications industry. Third, and most important for purposes of this litigation, the confidentiality of communications was guaranteed by a regulation that had been urged by persons interested in radio for private, commercial purposes. The provision stated that, under pain of criminal penalty:

> No person or persons engaged in or having knowledge of the operation of any station or stations, shall divulge or publish the contents of any messages transmitted or received by such station, except to the person or persons to whom the same may be directed, or their authorized agent, or to another station employed to forward such message to its destination, unless legally required to do so by the court of competent jurisdiction or other competent authority.

Ch. 287, § 4, reg. 19, 37 Stat. 302.

Regulation 19 did not contain any prohibition on the unauthorized interception or reception of radio communications, because the principal problem then faced by commercial users was the possibility that confidential messages would be disclosed by radio operators and other persons directly involved in the transmission process. Equipment that would have allowed the unauthorized reception of radio transmissions was not yet so widely available as to cause concern. Thus, in enacting Regulation 19, Congress sought to promote the growth of radio for commercial purposes by providing security for all administratively authorized transmissions for which the sender desired confidentiality.

The Radio Act of 1927, Pub.L. No. 69–632, 44 Stat. 1162, was designed to remedy problems caused by the rapid growth of the radio communications industry, particularly of commercial broadcast stations, in the years following the Radio Act of 1912. *See*

*National Broadcasting Co. Inc. v. United States,* 319 U.S. 190, 211–13, 63 S.Ct. 997, 1007–1008, 87 L.Ed. 1344 (1943); S. Davis, *The Law of Radio Communication* 54 (1927). The 1927 Act established the Federal Radio Commission ("FRC") and gave it broad authority to control nearly every aspect of the radio industry, thereby overcoming judicial and administrative determinations that severely limited the power of the Secretary of Commerce and Labor to control the use of the airways under the Radio Act of 1912. *See, e.g., Hoover v. Intercity Radio Co.,* 286 F. 1003 (D.C.Cir.1923), *writ dismissed,* 266 U.S. 636, 45 S.Ct. 10, 69 L.Ed. 481 (1924). Among the specific powers accorded the FRC were the authority to grant licenses, classify radio stations, determine the nature of the services to be provided by each class of stations and each individual station, and determine permissible power levels and operation times. The licensing authority was to "make such a distribution of licenses, bands or frequency of wave lengths, periods of time for operation, and of power among the different States and communities as to give fair, efficient, and equitable radio service to each of the same." The Radio Act of 1927, *supra,* § 9. Neither the 1927 Act nor its subsequent amendments provided any clearer guidance for issuing licenses and establishing services than the broad, highly discretionary standard of "public convenience, interest, or necessity." *Federal Radio Commission v. Nelson Brothers Bond & Mortgage Co.,* 289 U.S. 266, 285, 53 S.Ct. 627, 636, 77 L.Ed. 1166 (1933).

Regulation 19 to section 4 of the Radio Act of 1912 was incorporated into section 27 of the 1927 statute. The revised provision contained the same general prohibitions against disclosure as its predecessor, and added broad restrictions on the unauthorized interception or reception of radio communications. The legislative history of the 1927 Act does not entirely explain this revision. But the Senate Report stated that "[t]he provisions regarding the protection of . . . messages against reception and use by unauthorized persons are largely a redraft of existing law and seem necessary and proper provisions." S.Rep. No. 772, 69th

Cong., 2d Sess. 5 (1926). The section was actually more than "largely a redraft." It was, rather, an extension of protection apparently necessitated by the increasingly widespread availability of equipment capable of receiving radio transmissions intended for private use. Congress extended the protection in Regulation 19 to ensure that technological developments did not undermine the guarantees of confidentiality that were provided by the 1912 Act.

At the same time, however, the relatively new, yet burgeoning field of radio broadcasting added a new dimension to the radio communications industry. Broadcast stations, unlike other commercial users of radio, sought to have their transmissions reach as wide an audience as possible. The prohibitions in section 27 created the need for an exception to allow transmissions, by broadcasters and others who sought to reach the general public, to be intercepted and received without violating federal law. Section 27, therefore, also provided "[t]hat this section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcasted or transmitted by amateurs or others for the use of the general public. . . ." The Radio Act of 1927, *supra*, § 27. The proviso, therefore, was aimed at enabling those who wished to reach the general public to do so without fear; it was not motivated by any expressed intention to permit access to signals that senders wished to keep from the general public.

The next major step in the federal regulation of the communications industry came in the Communications Act of 1934, Pub.L. No. 73–416, 48 Stat. 1064. The 1934 Act was one of the most comprehensive regulatory statutes ever devised by Congress. It was designed to combine the regulatory power that had previously been delegated to several agencies, including the Federal Radio Commission, into one agency, the Federal Communication Commission ("FCC"). S.Rep. No. 781, 73d Cong., 2d Sess. (1934); H.Rep. No. 1850, 73d Cong., 2d Sess. (1934). The statute has been called the "high-water mark of congressional abdication of power to the regulatory agency."

IV B. Schwartz, *The Economic Regulation of Business and Industry* 2374 (1973). Its overall structure and most of its specific provisions have survived forty years of changes in communications technology, including the development of television.

The stated purpose of the 1934 Act was to regulate radio and wire communications in order to provide the people of the United States with "rapid, efficient, Nation-wide, and world-wide wire and Radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. The statute carefully separates common carriers from radio broadcasters. The definition of a common carrier in the 1934 Act provides, in part, that "a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier." 47 U.S.C. § 153(h). The 1934 Act, unlike its predecessors, contains a specific definition of "broadcasting" as "the dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations." 47 U.S.C. § 153(*o*). Otherwise, the authority previously exercised by the FRC, such as to grant licenses, classify stations, assign frequencies, and control the nature and character of broadcast signals, was accorded the FCC. 47 U.S.C. § 303. And the criteria for determining whether an application for a license should be granted were left unchanged; the FCC was obligated to determine whether "public convenience, interest, or necessity would be served thereby." *Id.* §§ 307(a) & 309(a). The FCC was given the same discretion as was enjoyed by the FRC to apply this standard as it saw fit, so long as relevant criteria were adequately considered. *National Broadcasting Co. v. United States,* 319 U.S. 190, 215–17, 63 S.Ct. 997, 1009, 87 L.Ed. 1344 (1943); *Federal Communications Commission v. Pottsville Broadcasting Co.,* 309 U.S. 134, 139, 60 S.Ct. 437, 440, 84 L.Ed. 656 (1940).

Section 27 of the Radio Act of 1927 became section 605 of the 1934 Act. 47 U.S.C. § 605. Aside from a provision that extended the section to cover communications by wire, no major changes were made by the

new provision. The proviso, excluding certain transmissions from the section's prohibitions, was identical to the predecessor statute except that the word "broadcasted" in the 1927 Act was changed to "broadcast," and a comma was added to separate the word from the rest of the phrase. No legislative history to the 1934 Act is directly relevant to the issues in this litigation. The committee reports from both the House of Representatives and the Senate state only that "[s]ection 605, prohibiting unauthorized publication of communications, is based upon § 27 of the Radio Act, but is also made to apply to wire communications." H.Rep. No. 1850, *supra*, at 9; *see* S.Rep. No. 781, *supra.* Indeed, except for minor changes in wording and punctuation, made when the section was amended as part of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 223, section 605 is the same today as it was in 1934. The proviso now states that the prohibitions contained in section 605 "shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public or which relates to ships in distress." 47 U.S.C. § 605.

The 1934 Act requires the FCC to "[a]ssign bands of frequencies to the various classes of stations, and assign frequencies for each individual station...." 47 U.S.C. § 303(c). Pursuant to this authority, the FCC has prescribed detailed regulations governing the allocation and permissible uses of the vast range of frequencies on which radio communication is feasible. 47 C.F.R. § 2.101–106. Specific bands have been assigned for broadcasting; others have been designated for use by aircraft, ships, amateurs, common carriers, and other users. *Id.* § 2.106.

Prior to 1972, the frequency band ranging from 2150 to 2162 MHz was allocated to common carriers to provide point-to-point microwave radio service. FCC, Notice of Inquiry, Proposed Rulemaking and Order, Dkt. No. 80–112 (May 2, 1980). In response to requests by applicants for a frequency assignment to provide closed circuit televi-sion service to their customers, the FCC issued a Notice of Proposed Rulemaking on April 26, 1972. 34 F.C.C.2d 719. The FCC proposed to establish a new service, called Multipoint Distribution Service ("MDS") to allow common carriers to make closed circuit television available to their customers. This new service was "to provide for relay of instructional and training television to schools, industry, municipal government and for other miscellaneous uses such as the coverage of business, industry or medical conventions." 34 F.C.C.2d at 719.

The new MDS rules were finally promulgated in January 1974. Docket No. 19493, FCC 74–34, 45 F.C.C.2d 616. The regulations authorized applications to provide MDS service by those "legally, technically, financially, and otherwise qualified," 47 C.F.R. § 21.32(b)(5), so long as there are available frequencies and "the grant will serve the public interest, convenience, and necessity." 47 C.F.R. § 21.32(a). Neither the new rules nor the accompanying report and order to the Commission, nor the regulations, specify the permissible uses of MDS, except that the regulations as adopted provide that—with certain exceptions—MDS stations "may render any kind of communications service consistent with the Commission's Rules and the legally applicable tariff of the carrier." 47 C.F.R. § 21.-903(b). That entertainment programming was within the class of MDS services contemplated by the FCC is proved by the simultaneous promulgation of regulations concerning the annual reports that MDS common carriers were obligated to file. These reports are required to show the total transmission hours during the prior calendar year in a number of programming categories, including one designated "entertainment." 47 C.F.R. § 43.72(a)(5)(iii).

The regulations also provide, among other things, for controls on interference with other MDS users, *id.* § 21.902; maximum transmitter power, *id.* § 21.904; requirements for transmitting antennas, *id.* § 21.-906; and other transmission standards, *id.* § 21.907. Many of these regulations differ substantially from analogous regulations

promulgated to govern broadcast stations. *See generally* 47 C.F.R. §§ 73.1–73.4280. Moreover, the regulations also require that the carrier specify, in a tariff filed with the FCC, "the parameters of the service to be provided, including the degree of privacy of communications a subscriber can expect in ordinary service. If the ordinary service does not provide for complete security of transmission, the tariff shall make provision for service with such added protection upon request." *Id.* § 21.903(c).

## B. *Application of Section 605 to HBO/MDS Transmissions*

The legislative and regulatory history of section 605 refutes defendants' argument that HBO's transmissions should be seen as intended for the general public within the meaning of the proviso to section 605.

■ First, the fact that HBO's programs can be received by equipment that is readily available to the general public does not deprive HBO's communications of section 605's protection. Beginning with regulation 19 to section 4 of the Radio Act of 1912, and continuing to the present, Congress has sought to protect transmissions that are among those easiest to disclose or intercept. The 1912 Act sought to restrain only those persons who had direct access to confidential communications, because they were the danger confronting the privacy of the transmission process at that time. This prohibition was extended in 1927 to bar any unauthorized reception and interception in response to the technological advances that had made equipment capable of receiving confidential radio communications widely available. The fact that Congress, in 1927, removed broadcasts, and other transmissions intended for the general public, from the protection of the section does not establish that Congress meant to protect only transmissions that were difficult to intercept; rather, the measure was designed to ensure that persons who wanted their transmissions to be generally received would not be thwarted by the prohibitions on reception or interception.

Moreover, section 605 has long been interpreted to prohibit unauthorized interception and disclosure without regard to the technical difficulties involved. In decisions under the 1934 Act, the Supreme Court has held that information obtained through the use of wiretaps could not be used as evidence in criminal prosecutions because the gathering of the information was accomplished in violation of section 605. *Weiss v. United States,* 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939); *Nardone v. United States,* 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937). In neither case did the Court consider, because it would have found irrelevant, the method by which the interceptions were accomplished. In *United States v. Fuller,* 202 F.Supp. 356 (N.D.Cal.1962), for example, an individual was convicted for intercepting radio transmissions between members of the San Francisco police and fire departments and disclosing them to a radio station. The availability of inexpensive equipment to accomplish such results makes the conduct no more permissible. Other courts have specifically held that the means used to intercept confidential communications is irrelevant in determining whether section 605 was violated. *See, e.g., United States v. Polakoff,* 112 F.2d 888, 889 (2d. Cir. 1940), *cert. denied,* 311 U.S. 653, 61 S.Ct. 41, 85 L.Ed. 418 (1940). *See also United States v. Gruber,* 123 F.2d 307 (2d Cir. 1941) (upholding the conviction of a lawyer who induced a telephone company operator to connect his office telephone to calls between members of the Securities and Exchange Commission).

■ Second, HBO's failure to restrict reception of its transmissions by scrambling its signal cannot be given the significance attached to it by defendants. There is no indication in the statutory language, or in the legislative or regulatory history, to suggest that Congress meant to protect only those persons who take affirmative steps to keep transmissions confidential. The FCC could have required that common carriers scramble all MDS signals, but it has relied instead on regulations that allow carriers to modify signals or equipment at their own discretion or upon the request of their sub-

scribers. 47 C.F.R. § 21.907(e), 21.908(f). All carriers must include in their tariffs a provision that they will add signal protection at the request of a subscriber, *id.* § 21.903(c), but the cost of such protection would surely be passed on to the subscriber and its customers. Testimony at the hearing demonstrated that scrambling the MDS signal would be expensive if done without violating Microband's obligation to provide its customers with high-quality reception. 47 C.F.R. § 21.907–08. Microband would need to purchase a new transmitter, at a cost of about $400,000, and HBO would have to install descrambling units on each subscriber's television set, or with each MDS antenna, at a cost of up to $150 per set. Tr. 34–35 (Testimony of Gilbert E. Jones, Jr.).

Signal scrambling, or any other technical protection now available, might not substantially enhance signal security. Testimony at the hearing indicated that all practicable forms of scrambling are subject to descrambling. Furthermore, defendant ACT represented in its dealer's manual that, if HBO scrambled its own signal, ACT would quickly provide an inexpensive descrambling unit to prior purchasers of ACT's antenna and down-converter. Plaintiff's Exhibit ("PX") 3, § 10, ¶ 8. At the hearing, ACT's President, Kenneth L. DeCosta, testified that he had recently decided that ACT would not distribute descrambling equipment after all, because he now believes that the sale or distribution of such equipment would violate federal law. Tr. 134, 140–41. But even if this dubious testimony were credited, descrambling equipment remains readily available. Finally, commercial television sets produced at this time are as yet incapable of receiving MDS without supplementary equipment. So long as this is so, the FCC and HBO may reasonably assume that the ordinary, law-abiding citizen will not unilaterally take steps to intercept MDS.

Defendants' contention that HBO's programs are not entitled to section 605 protection because they are indistinguishable from those programs presented on commercial television stations is similarly unconvincing. HBO claims, to begin with, that its programming is different because its programs are presented without commercial interruption, and because they are often motion pictures or sporting events that have not been made available to commercial television stations. More important, nothing in the statutory language, legislative and regulatory history, or judicial interpretations of section 605 suggests that a transmission must be unusual or unique to gain protection under section 605. The Radio Act of 1912 and subsequent statutes barred unauthorized disclosure, and later interception and reception, of all private radio transmissions. There was no requirement that the party who wished to keep a transmission confidential prove that the communication was dissimilar from other, available transmissions. The proviso to the 1927 and subsequent statutes did not change this basic part of the statute; rather, they merely exempted from coverage those communications that were intended to reach the general public. As noted previously, the FCC has determined that MDS can be used for any kind of communications service that is consistent with the Commission's rules and the applicable tariff. 47 C.F.R. § 21.903(b); *see* 47 C.F.R. § 43.-72(a)(5)(iii).

Defendants contend that a decision in favor of HBO would mean that a commercial television station, such as a VHF broadcaster, could declare itself a "private" broadcaster, charge individual customers for receiving its programs, and then sue manufacturers of ordinary television sets for selling products designed to intercept its signal. *Second Supplemental Memorandum in Opposition to HBO's Application for Injunctive Relief* at 6. That hypothetical series of events is unrealistic, however, because any attempt by a commercial television station so to limit its signal would contravene its license to *broadcast,* which not only permits the broadcaster access to the general public, but also requires the broadcaster to assure the public's access to its signal. HBO, on the other hand, operates pursuant to a license that is designed

to promote commercial intercourse by restricting access, and HBO would be prohibited from becoming a broadcaster by permitting access by the general public to its signal.

It is true, as defendants argue, that HBO wants its programs to reach as wide an audience as possible. But this does not render its transmissions "intended for the general public" and therefore exempt from the protection of section 605. In *Functional Music, Inc. v. Federal Communications Commission,* 274 F.2d 543 (D.C.Cir.), *cert. denied,* 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 81 (1958), the court reviewed an FCC determination that a subscription service, whereby an FM station provided "background music" without commercials by transmitting to subscribers supersonic signals that cut off the normal programming during advertisements, did not constitute broadcasting as defined in section 153(*o*) of the statute, and therefore that it was improper for a radio station licensed to "broadcast" to provide the services. The court vacated the FCC order, finding that such service fit within the statutory definition of broadcasting. Judge Bazelon wrote: "Broadcasting remains broadcasting even though a segment of those capable of receiving the broadcast signal are equipped to delete a portion of that signal," and went on to state that "functional programming can be, and is, of interest to the *general* radio audience." *Id.* at 548 (emphasis in original).

Defendants urge that *Functional Music* establishes that "the transmission of programming which [is] of interest to the general public constitute[s] broadcasting even though one cannot view the programs without paying a fee for special equipment." Defendants' Memorandum in Opposition to Application for Injunction at 7–8. But *Functional Music* does not support defendants' position. The case did not involve an interpretation of section 605; rather, it resulted from an FCC determination that a certain type of transmission did not fit within the statutory definition of broadcasting in section 153(*o*), for the purpose of determining whether a given radio station was operating within the terms of its broadcast license. The Court of Appeals for the District of Columbia Circuit was acting on a direct challenge to an FCC order issued in accordance with statutory authority, and found the FCC's determination "clearly erroneous." 274 F.2d at 548. Moreover, in *Functional Music* the court looked to the underlying radio signal and found that it was intended to reach the general public. The court noted that the radio station derived substantial revenue from advertisers who desired to reach a large audience. The fact that certain persons could delete a portion of the signal did not negate that basic intent of the transmitting party. If anything, therefore, *Functional Music* stands for the general proposition that it is necessary to look to the intent of the transmitting party in order to determine whether a transmission is a broadcast within the meaning of section 153(*o*).

The *Functional Music* decision is consistent with a number of FCC determinations about the types of transmissions that are properly within the scope of a broadcast license, as well as with cases that have considered similar issues in the context of section 605. In fact, Judge Bazelon specifically contrasted the transmissions at issue in *Functional Music* with cases holding that transmissions that were essentially private in nature—intended for a specific and limited audience—were impermissible under a broadcast license, such as the transmission of coded horse-race results in *Bremer Broadcasting Co.,* 2 F.C.C. 79 (1935), local police messages in *Adelaide Lillian Carrell,* 7 F.C.C. 219 (1939), and spiritual, vocational and marital advice to specified listeners in *Scroggin & Company Bank,* 1 F.C.C. 194 (1934). *Functional Music, Inc. v. Federal Communications Commission, supra,* 274 F.2d at 548.

The same rationale has been used in cases involving section 605. For example, in *KMLA Broadcasting Corp. v. Twentieth Century Cigarette Vendors Corp.,* 264 F.Supp. 35 (C.D.Cal.1967), defendants were found to have violated section 605 by distributing equipment that allowed purchas-

ers to receive "background music" transmitted by plaintiff for the exclusive use of paying subscribers via a special signal, called a multiplex channel, allocated by the FCC for that purpose. The court found that, because the background music could not be heard by anyone who had not paid the subscription fee, the program was not intended for the general public and was therefore protected by section 605's prohibitions on unauthorized interception and disclosure. The fact that the background music was similar to the type of programming offered by commercial radio stations did not affect the court's decision. Similarly, in *Chartwell Communications Group v. Westbrook, supra*, a subscription television service ("STV"), whereby plaintiff broadcast a scrambled signal via a standard UHF frequency, was held not to be broadcasting because it was intended only for paying subscribers. *Id.* at 465. *See also National Subscription Television v. S & H TV, supra*. In *Home Box Office, Inc. v. Pay TV of Greater New York, Inc., supra*, Judge Nickerson considered the unauthorized interception of the same type of MDS transmissions that are at issue in this litigation and concluded that the signals were not intended for the use of the general public and thus were within the protection of section 605. *Id.* at 528.

The only contrary authority left standing is *Orth-O-Vision, Inc. v. Home Box Office, Inc., supra*, where the court refused to grant HBO summary judgment on its claim that a former affiliate's unauthorized sale of HBO's programming violated section 605. In language unnecessary to its disposition of the case, the court found that HBO programs were intended to be received by the general public. *Id.* at 682. The decision was based on the content of HBO's programming, which was similar to commercial television broadcasting, and on the fact that the FCC had taken the position that STV service, which the court found to be analogous to MDS, was not protected by section 605.

Most of the courts that have discussed whether a transmission is protected by section 605 have given considerable weight to the apparent intent of Congress and the FCC to keep certain communications private. In *KMLA Broadcasting Corp. v. Twentieth Century Cigarette Vendors Corp., supra*, the court pointed out that the FCC had established a comprehensive regulatory scheme for the multiplex transmissions at issue in the case, and that the regulations differed significantly from those for broadcast stations, a distinction that also applies to the regulations promulgated for MDS. 264 F.Supp. at 42. In *Chartwell Communications Group v. Westbrook, supra*, 637 F.2d at 465, the court noted that, though the FCC's action might be read as a ruling that STV was "broadcast" for purposes of section 605, a recent FCC staff report had challenged the validity of such a conclusion.

The defendants in the present case rely heavily on the aforementioned FCC position, announced in 1966, that STV is broadcasting within the meaning of section 153(*o*). *See* Notice of Proposed Rule Making and Notice of Inquiry, 3 F.C.C.2d 1 (1966), reconfirmed in FCC's Fourth Order and Report, 15 F.C.C.2d 466, 472 (1968). But even to the extent that the FCC's position may have continued validity, it is not controlling in the present case. STV programs are transmitted on a frequency that has been set aside by the FCC for television broadcasting. Thus the FCC may have been within its statutory power to classify radio stations and to assign frequencies, 47 U.S.C. § 303(a) & (c), when it determined that the fact that certain individuals could not properly receive STV signals without descrambling equipment did not remove such signals from the statutory category of broadcasts. But the FCC has made no such determination with respect to MDS signals. Both the regulatory scheme and the official position of the FCC reflect a determination that MDS signals are not "broadcast" and are therefore within the protection of section 605. FCC 1979 Public Notice, *supra*.

The history of FCC regulation of MDS transmissions demonstrates that the FCC expected and required MDS to be used for restricted access transmissions. To allow

defendants, or any other person or group, to intercept MDS transmissions would defeat this purpose. Successful utilization of the MDS band requires protection from unauthorized interception for precisely the same kinds of reasons that led the draftsmen of the earlier radio acts to provide protection for confidential commercial communications. Defendants threaten the viability of a type of transmission that the MDS system was specifically designed to encourage, and there is no countervailing social or policy consideration that would justify protection for their exploitative business operation. In fact, the conduct and purposes of defendants in this case are also relevant considerations in judging the FCC's position. The FCC or HBO might face difficulties, for example, in enforcing section 605 against a manufacturer or purchaser of a television receiver or other related device that enables consumers in general to receive MDS among a wide range of previously designated "point-to-point" transmissions. Those difficulties need not now be examined, however. ACT, its President, and its distributors have knowingly sought to sell the products at issue for the specific (if not the sole) purpose of "bootlegging" HBO's signal in the New York area. They do not claim otherwise. The antenna involved is so designed that it receives frequencies on which MDS is transmitted, and nothing else. As applied to these defendants, therefore, and the product they sell, the FCC's position is reasonable and clearly within the purpose of section 605.

In conclusion, the FCC's judgment that unauthorized interception of MDS transmissions violates section 605 is entitled to the deference normally accorded to the opinions of expert agencies to which Congress has delegated broad policy-making authority. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Power Reactor Development Co. v. International Union of Electrical, Radio and Machine Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961). Courts must be hesitant to substitute their own judgments for those of the FCC. *Mt. Mansfield Television, Inc. v. Federal Communications Commission,* 442 F.2d 470, 482

(2d Cir. 1971). "[C]ourts should not overrule an administrative decision merely because they disagree with its wisdom"; they should uphold the decision if they find that it "was not arbitrary or against the public interest as a matter of law." *Radio Corporation of America v. United States,* 341 U.S. 412, 420, 71 S.Ct. 806, 810, 95 L.Ed. 1062 (1951) (footnotes omitted). Moreover, the record in this case establishes that the FCC's judgments pertaining to MDS transmissions are reasonable when applied to the facts of this case, where the defendants' purpose in selling the equipment involved is to enable purchasers to intercept HBO's signal, where the equipment is designed specifically and solely to intercept the MDS radio frequency band, and where without the equipment viewers with conventional sets would be unable to view HBO and unlikely to seek to do so through some illegitimate means.

Plaintiff will prepare an injunctive order consistent with this opinion, on ten days notice to defendants. The order should exclude from its coverage the individual defendant, Richard Kalin, Esq., who has already ceased selling ACT's equipment, and who has assured the Court that he will abide by the Court's ruling without any order to that effect.

SO ORDERED.