NATIONAL SATELLITE SPORTS, INC., Plaintiff,

v.

TIME WARNER ENTERTAINMENT COMPANY, L.P., Defendant.

National Satellite Sports, Inc., Plaintiff,

v.

Time Warner Entertainment Company, L.P., Defendant.

Nos. 02 CIV. 342(JSR), 02 CIV. 346(JSR).

United States District Court, S.D. New York.

April 4, 2003.

Michael Dell, Lauren Freeman Bosworth, Kramer Levin Naftalis & Frankel LLP, New York City, for Plaintiffs.

Henk J. Brands, Eugene M. Paige, Paul, Weiss, Rifkind, Wharton & Garrison, Washington, DC, John Hearn, Robert P. Parker, Paul, Weiss, Rifkind, Wharton & Garrison, New York, Randolph Frank Iannacone, Forster & Iannacone, Middle Village, Neil Gorsuch, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC, for Defendants.

## MEMORANDUM ORDER

RAKOFF, District Judge.

Plaintiff National Satellite Sports, Inc. ("NSS") alleges in these consolidated actions[1] that defendant, Time Warner En-

---

**1.** Additionally, the following two cases, by stipulation of the parties so ordered by this Court on May 30, 2002, have been consolidated for all pre-trial purposes with the above-captioned actions: *Nat'l Satellite Sports, Inc. v. Time Warner Entm't Co., L.P.*, 02 Civ. 3883(JSR), formerly CV-02-0170 (E.D.N.Y.); and *Nat'l Satellite Sports, Inc. v. Time Warner*

*Entm't Co., L.P., et al.*, 02 Civ. 3667(JSR), formerly 8:01-cv-1730-T-24MSS (M.D.Fl.). In addition, the following four cases, likewise consolidated, have subsequently settled and been dismissed by stipulation: *Nat'l Satellite Sports, Inc. v. AOL Time Warner Inc., et al.*, 02 Civ. 3837(JSR), formerly 5:01CV1631

tertainment Company L.P. and its affiliates (collectively "Time Warner"), violated the anti-piracy provisions of the Communications Act of 1934 (the "Communications Act"), 47 U.S.C. §§ 553 and 605, by broadcasting without authorization various boxing matches (the "Events"), including the January 16, 1999 boxing match between Mike Tyson and Francois Botha (the "Tyson Event"), the September 18, 1999 boxing match between Oscar De La Hoya and Felix Trinidad (the "De La Hoya Event"), and other, unnamed boxing matches, in violation of NSS' exclusive rights to broadcast the Events. Before the Court are cross-motions for summary judgment seeking, respectively, judgment in favor of Time Warner dismissing the actions and partial judgment in favor of NSS holding Time Warner liable.

By way of background, it is undisputed that NSS held the exclusive rights to market, exhibit, and sell the Tyson Event in the United States in "theaters, arenas, casinos, auditoriums, bars, restaurants or other similar locations of public assembly ... where an admission fee or other consideration is charged and received." *See* Affidavit of Michael J. Dell, Esq., dated September 17, 2002 ("Dell Aff."), Ex. 19 (Closed–Circuit License Agreement) at 1. NSS also held a regional sublicense from an entity called "Entertainment by J & J, Inc." that conveyed to NSS the exclusive rights to exhibit the De La Hoya Event to similar establishments in Florida, Illinois (exclusive of casinos), New Mexico, Washington, D.C., Utah, Michigan, and Indiana (exclusive of casinos), *see* Dell Aff., Exh. 20 (Closed Circuit Television License Agreement: Oscar De La Hoya v. Felix Trinidad & Addendum to Closed Circuit Television License Agreement Between Entertainment by J & J, Inc. and National Satellite Sports, Inc.); but the parties dispute whether Entertainment by J & J had the right to issue such a license, *see* Pl. Rule 56.1 Statement, at ¶ 2; Def. Rule 56.1 Statement, at ¶ 2. NSS also alleges it possessed similar rights as to the other Events.

Conversely, Time Warner held only the rights to transmit the Events (on a pay-per-view basis) to "persons residing in private dwelling units," and not to "non-residential establishments," such as "(i) any locations open to the public; (ii) locations where an admission fee [was] charged; (iii) hotels, motels, and other places of transient residence; and (iv) commercial establishments such as restaurants and bars." *See* Dell Aff., Ex. 21 (PPVN Affiliation Agreement) at 3, 15. Nonetheless, Time Warner transmitted the Tyson Event to at least five bars, *see* Pl. Rule 56.1 Statement, at ¶ 13; Def.'s Response to Pl. Rule 56.1 Statement, at ¶ 13, and transmitted the De La Hoya Event to at least one bar, *see* Pl. Rule 56.1 Statement, at ¶ 18; Def. Response to Pl. Rule 56.1 Statement, at ¶ 18. NSS also suggests that Time Warner permitted similar improper transmission of the other Events.

Notwithstanding these background facts, it is still the case, as the Court indicated at oral argument, *see* transcript 10/16/02, that genuine issues of material fact remain in dispute pertinent to each of the parties' claims and counterclaims implicated by the instant motions, except with respect to the issue of whether certain of NSS' claims are time-barred. Specifically, Time Warner argues that the applicable limitations period for anti-piracy claims brought under the Communications

---

(N.D.Ohio); *Nat'l Satellite Sports, Inc. v. AOL Time Warner Inc., et al.,* 02 Civ. 3989(JSR), formerly C2–01–1239 (S.D.Ohio); *Nat'l Satellite Sports, Inc. v. Paragon Communications, et al.,* SA–01–CA–0872 (W.D.Tex.); and *Nat'l Satellite Sports, Inc. v. Time Warner Cable of Southeastern Wisconsin, L.P.,* 02 Civ. 3928, formerly 02–C–40 (E.D.Wis.).

Act is two years, while NSS argues that it is three years.

■ The issue arises because, even though the Communications Act provides a two year statute of limitation for certain actions brought against common carriers, it is silent as to the period of limitations applicable to private suits brought for violations of the Act's anti-piracy provisions against companies that do not qualify as common carriers. Ordinarily, in such circumstances, a court should "apply the limitations period of the state-law cause of action most analogous to the federal claim." *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 542 (2d Cir.1999), *quoting Sandberg v. KPMG Peat Marwick, LLP*, 111 F.3d 331, 333 (2d Cir.1997). But "where (1) a federal rule of limitations clearly provides a closer analogy than state alternatives, and (2) the federal policies at stake and the practicalities of the litigation render the federal limitation a significantly more appropriate vehicle for interstitial lawmaking," courts are to apply the analogous federal, rather than state, limitations period. *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 394 (2d Cir. 2001) (internal quotations omitted), *quoting Phelan v. Local 305*, 973 F.2d 1050, 1058 (2d Cir.1992), *cert. denied*, 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993).

■ Applying these standards to the instant issue, the initial inquiry is as to whether the two-year limitations period provided for other purposes in the Communications Act itself, 47 U.S.C. § 415(b), should also be applied here. Time Warner argues that, while § 415(b) only expressly applies to common carriers, which Time Warner is not, *see United States v. Southwestern Cable Co.*, 392 U.S. 157, 169 n. 29, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) (finding that cable companies are not common carriers), it would be "illogical and unfair to expose cable operators to liability

under a statute originally intended to apply to common carriers ... while denying cable operators the protection of the accompanying statute of limitations." Memorandum in Support of Time Warner's Motion for Summary Judgment, at 15.

Both the premise and conclusion of this argument are, however, belied by the legislative history of the Communications Act and its predecessors. To begin with as noted by the court in *Home Box Office, Inc. v. Advanced Consumer Tech. Movie Antenna, Inc.*, 549 F.Supp. 14, 17 (S.D.N.Y.1981), § 605 of the Act, the first of the anti-piracy provisions here involved, derives from an earlier provision, *i.e.* Regulation 19, § 4, of an Act to Regulate Radio Communication, Act of Aug. 13, 1912, Pub.L. No. 62–264, § 4, reg. 19, 37 Stat. 302, which provided in relevant part:

No person or persons engaged in or having knowledge of the operation of any station or stations, shall divulge or publish the contents of any messages transmitted or received by such station, except to the person or persons to whom the same may be directed, or their authorized agent, or to another station employed to forward such message to its destination, unless legally required to so do by the court of competent jurisdiction or other competent authority.

*Id.* Neither that provision—nor the 1912 Act as a whole, which applied to "any system of electrical communication by telegraphy or telephony without the aid of any wire connecting the points from and at which the radiograms, signals, or other communications are sent or received," *id.* § 6,—was limited to common carriers.

Fifteen years later, when Congress superseded the 1912 Act with the Radio Act of 1927, Pub.L. No. 69–632, 44, Stat. 1162, it included the language of Regulation 19 as § 27 of the new Act, but added new, broad restrictions on the unauthorized in-

terception or reception of radio communications. *Id.* *See Home Box Office, Inc.,* 549 F.Supp. at 18–19. Overall coverage of the Act was likewise broadened to include "any intelligence, message, signal, power, pictures, or communication of any nature transferred by electrical energy from one point to another without the aid of any wire connecting the points from and at which the electrical energy is sent or received and any system by means of which such transfer of energy is effected." Radio Act of 1927 § 31. Thus, even more clearly than in 1912, the Radio Act of 1927, both as a whole and with particular reference to piracy, extended well beyond regulation of common carriers.

Section 27 of the Radio Act of 1927, in turn, became § 605 of the Communications Act of 1934, Pub.L. No. 73–416, 48 Stat. 1064, but was extended still further to apply to both wire and radio transmissions. *See Home Box Office,* 549 F.Supp. at 19–20. Specifically, the provision now prohibited "(1) the unauthorized divulging or publishing of wire or radio communications by the operators responsible for receiving such communications; (2) the unauthorized interception and divulging of wire or radio communications; (3) the unauthorized receipt and use of wire or radio communications for the benefit of the unauthorized receiver or someone else not entitled to the communication; and (4) the divulging, publication, or use of unlawfully intercepted information by anyone knowing that the information was wrongfully obtained." *United States v. Norris,* 88 F.3d 462, 465 (7th Cir.1996). *See also* Communications Act § 605. The wire and radio communications to which the provision applied were defined, in § 3 of the Act, as follows:

> For purposes of this Act, unless the context otherwise requires—
> (a) "Wire communication" or "communication by wire" means the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable,

or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things; the receipt, forwarding, and delivery of communications) incidental to such transmission.
> (b) "Radio communication" or "communication by radio" means the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

Communications Act § 3 (codified at 47 U.S.C. § 153(a) & (b)). Further, by subsequent amendment, Congress provided a cause of action against anyone who violated § 605, *see* § 605(e)(3)(A).

None of this was in any way limited to common carriers. It is true that other provisions of the Act were so limited, but those provisions had a separate history and purpose. Among other things, certain provisions of the Act transferred to the newly-created Federal Communications Commission certain regulatory powers over common carriers previously held by the Interstate Commerce Commission. More generally, the Act distinguished between common carriers and other companies subject to its purview, and imposed stricter and more numerous controls on the former than on the latter.

The common carriers so affected were defined as "any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this Act; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier."

Communications Act § 3(h) (codified as amended at 47 U.S.C. § 153(h)). ·Such carriers were subject both to the general prohibitions of the Act, such as § 605, and to the further provisions directed only at common carriers; but in either event, a uniform statute of limitation applied to such actions. Specifically, § 415(b), as then enacted, provided that "All complaints against carriers for the recovery of damages not based on overcharges shall be filed with the Commission within one year from the time the cause of action accrues, and not after, subject to subsection (d) of this section." Communications Act § 415(b).

This section, as noted by the court in *Ward v. Northern Ohio Telephone Co.*, 251 F.Supp. 606, 610 (N.D.Ohio, 1966), derived, in turn, from § 16(3)(b) of the Interstate Commerce Act, which similarly stated that "All complaints against carriers subject to this Act for the recovery of damages not based on overcharges shall be filed with the [Interstate Commerce] commission within two years from the time the cause of action accrues, and not after, subject to subdivision (d)." Act of June 7, 1924, Pub.L. 68–247, § 16(3)(b), 43 Stat. 633. Thus, the uniform limitations period applicable to common carriers had its own legislative history that in no way implicated non-carriers.

▮ In short, the legislative history of the Communications Act shows that, while the anti-piracy provision, § 605, was al-ways intended to apply beyond common carriers, the statute of limitations for actions against common carriers, § 415(b), was always intended to apply just to common carriers and was irrelevant to the application of § 605 to non-carriers.[2] There is nothing, therefore, in either the language or the history of the Act that would support borrowing the limitations period as currently set forth in § 415(b) to apply to § 605 actions against non-carriers. Indeed, if anything, there is a negative implication to the contrary. *See generally, Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal citations omitted).

The analysis is much the same with respect to the other anti-piracy provision here involved, § 553 of the Communications Act, although that provision was not added until 1984, as part of the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, § 633, 98 Stat. 2779, 2796. That section, enacted in an effort to prevent theft of cable services, *see* H.R.Rep. No. 934, 98th Cong., 2d Sess., 83–84, *reprinted in* 1984 U.S.C.C.A.N. 4720–21; *see also Norris*, 88 F.3d at 466, created a cause of action against both carriers and non-carriers alike. It therefore, provided

---

**2.** This analysis is in no way altered by later amendments to sections 415(b) and 605. As to § 605, in 1968, as part of the Omnibus Crime Control and Safe Streets Act, Pub.L. No. 90–351, 82 Stat. 197, Congress deleted the reference to communication "by wire" from all but the first clause of § 605 and changed the phrase "any communication" to "any radio communication" in the second clause. *See id.* § 803. In addition, as part of the 1968 amendment, the designations (1) through (6) were added to the existing provi-sions of the first sentence, the introductory clause, "Except as authorized by chapter 119, title 18" was inserted, and other minor editorial changes were made. *See id. See also Int'l Cablevision*, 75 F.3d at 130. None of these amendments is relevant to the issue here presented. As to § 415(b), in 1974 that section was amended to change the limitations period from one to two years, *see* Act of Nov. 30, Pub.L. 93–507, § 414(b), but again that amendment in no way bears on the instant issue.

another opportunity for Congress to amend § 415(b) to apply to non-carriers as well as carriers, if it was so minded; but no such change was made. Thus, if anything, this more recent history reinforces the inference that Congress did not intend § 415(b) to apply to actions by non-carriers. *See Prostar v. Massachi,* 239 F.3d 669, 672 n. 6 (5th Cir.2001) ("Given that the language of § 415 refers only to carriers, we infer that Congress did not intend this provision to apply to non-carriers."); *That's Entm't, Inc. v. Centel Videopath, Inc.,* Case No. 93 C 1471, 1993 U.S. Dist. LEXIS 19488 at \*15–20 (N.D.Ill.Dec. 10, 1993) (implying by negative implication that Congress did not intend § 415(b) to apply to non-carriers).

■ Alternatively, Time Warner argues that the Court should borrow the two year statute of limitations applicable to theft of cable services under New York law, *see* N.Y. Penal Code § 165.15(4) & (11); N.Y.Crim. Pro. § 30.10(2)(c). New York law is relevant because, in borrowing an analogous state limitations period, the law of the forum state applies. *See Ceres Partners v. GEL Assocs.,* 918 F.2d 349, 353 (2d Cir.1990) (["T]his Circuit, like most others, has consistently held that the statute of limitations should be adopted by reference to the pertinent laws of the forum state.").

New York Penal Code § 165.15 provides in relevant part:

A person is guilty of theft of services when:

.　　.　　.　　.　　.

4. With intent to avoid payment by himself or another person of the lawful charge for any telecommunications service, including, without limitation, cable television service ... he obtains or attempts to obtain such service for himself or another person or avoids or attempts to avoid payment therefor by himself or another person by means of (a) tampering ... with the equipment of the supplier ..., or (b) offering for sale or otherwise making available ... any telecommunications decoder or descrambler ..., or (c) any misrepresentation of fact which he knows to be false, or (d) any other artifice, trick, deception, code or device.

.　　.　　.　　.　　.

Theft of services is [barring certain exceptions] a class A misdemeanor....

Since one of the primary purposes behind the enactment of § 553 was to discourage the theft of cable services, Time Warner argues that New York's statute prohibiting cable theft therefore provides an appropriate analog for determining the statute of limitations here applicable.

If there were no better alternative, this argument might prevail. But NSS argues, and the Court concludes, that there is a federal statute of limitations that provides a closer analogy and is otherwise preferable, to wit, the three-year statute of limitations applicable to actions brought under the Copyright Act, 17 U.S.C. § 507(b). Like the anti-piracy provisions of the Communications Act, the Copyright Act protects proprietary rights transmitted through modern media. *See UMG Recordings, Inc. v. MP3.Com, Inc.,* 92 F.Supp.2d 349 (S.D.N.Y.2000). Both statutes, moreover, have a similar remedial structure, providing a prevailing plaintiff with the choice of either actual or statutory damages, the possibility of a discretionary increase in statutory damages based on the culpability of the wrongdoer's conduct, and an award of costs and attorneys' fees, *see* 17 U.S.C. §§ 504–505; 47 U.S.C. §§ 553(c), 605(e).

Moreover, borrowing the period of limitations from the Copyright Act has the further substantial benefit of nationwide uniformity in implementing an act of inherently nationwide application. As the

Fifth Circuit explained in *Prostar:* "[C]able companies engage in multistate activities and [if a state statute of limitations were applied] would consequently be required to make fifty separate decisions in their efforts to investigate and pursue cable piracy. A single federal standard would eliminate these practical difficulties, facilitating resolution of the national problems addressed by the [Communications Act]." 239 F.3d at 676–77 (internal citations omitted). *See also, Kingvision Pay Per View, Ltd. v. Boom Town Saloon,* 98 F.Supp.2d 958, 963 (N.D.Ill.2000) ("[C]auses of action under the Cable Act are multistate in nature: they involve communications in interstate commerce that can lead to violations taking place in multiple states, with the prospect of potential forum shopping if multiple state statutes of limitations were to apply.").

Accordingly, the Court concludes that the three year statute of limitations borrowed from the Copyright Act applies to plaintiff's instant claims. None of NSS' remaining claims is barred by this limitation.[3]

For the foregoing reasons, the parties' cross-motions for summary judgment are hereby denied.[4] By no later than April 14, 2003, the parties should convene a joint conference call with Chambers to set a trial date.

SO ORDERED.

---

3. However, on consent, all claims were dismissed with respect to the following Events: *Jones v. Pazienza* (June 24, 1995); *Bowe v. Holyfield* (November 4, 1995), *Bowe v. Golata* (December 14, 1996), *De Lay Hoya v. Gonzales* (January 18, 1997), *Whitaker v. De La Hoya* (April 12, 1997), *De La Hoya v. Camacho* (September 13, 1997), *De Lay Hoya v. Rivera* (December 6, 1997), *Quartey v. De La Hoya* (February 13, 1999), *Lewis v. Grant* (April 29, 2000), and *Hamed v. Barrera* (April 7, 2001).

4. Following oral argument on the summary judgment motions but before the Court issued a bottom line ruling, Time Warner moved to supplement the record before the Court on the instant motions as a result of having subsequently discovered an Affidavit, dated July 5, 2001, of one Skip Klauber, Esq., Assistant General Counsel for plaintiff National Satellite Sports, Inc., that states in relevant part: "Notwithstanding the terms of the Closed Circuit Television Distribution Agreement for the January 16, 1999, Tyson/Botha fight entered into by National Satellite Sports, Inc., and Joe Hand Promotions, Inc., National Satellite Sports, Inc., granted to Joe Hand Promotions, Inc., the right to distribute the event in the state of New York." Time Warner contends that the "Closed Circuit Television Distribution Agreement" referred to is one dated November 24, 1998 (the "November 24 Agreement") that granted Joe Hand Promotions, Inc. the "exclusive right" to market and distribute the January 16, 1999 Tyson/Botha fight in Delaware, Louisiana, portions of New Jersey, Ohio, Oklahoma, Pennsylvania, Texas, and West Virginia, and that the extension of these exclusive rights to New York bars plaintiff's claims in this lawsuit. Plaintiff agrees that the November 24, Agreement is the "Closed Circuit Television Distribution Agreement" referred to, but argues that notwithstanding the terms of this agreement, NSS had the right to distribute the January 16, 1999 Tyson/Botha right in New York, as stated in the Affidavit, not because the November 24 Agreement was modified but by virtue of an agreement, dated December 17, 1998, that granted Joe Hand Promotions, Inc. the "non-exclusive" rights to market and distribute the program in question in New York. Thus, the Klauber Affidavit is just one more item as to which there is a genuine factual dispute precluding summary judgment.