637 F.2d 459
 61 A.L.R.Fed. 797, 6 Media L. Rep. 2368
 CHARTWELL COMMUNICATIONS GROUP, and National Subscription
Television Detroit, Plaintiffs-Appellants,
v.
Philip WESTBROOK, Ind. & d/b/a Pony Electronics; Robert
Moser, Jr., Ind. & d/b/a Video Vend, Defendants-Appellees.
 No. 80-1566.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 23, 1980.
Decided Dec. 29, 1980.
 
 Robert P. Hurlbert, Frank G. Pollock, Dickinson, Wright, McKean, Cudlip & Moon, Bloomfield Hills, Mich., Theodore R. Opperwall, Detroit, Mich., for plaintiffs-appellants.
 John B. Kemp, Kemp, Klein, Edelman & Beer, John L. Greenberg, Greenberg & Greenberg, Southfield, Mich., for defendants-appellees.
 Before BROWN and BOYCE F. MARTIN, Jr., Circuit Judges, and REED, District Judge.*
 BAILEY BROWN, Circuit Judge.
 
 
 1
 This case presents important questions concerning the nature of the over-the-air subscription television (STV) industry, and the extent to which it is protected by Section 605 of the Communications Act of 1934, 47 U.S.C. § 605. Appellants (Chartwell) operate a subscription television business in the Greater Metropolitan Detroit area. Chartwell's programming consists mainly of recently released movies, musical performances, and sporting events the typical fare of subscription and cable television services. Its services are marketed under the name "ON-TV."
 
 
 2
 Chartwell's programs are delivered to its subscribers by a television signal transmitted by WXON-TV, Channel 20, in Southfield, Michigan. WXON-TV has a subscription television license issued by the Federal Communications Commission (FCC), and Chartwell operates by virtue of a contract with WXON-TV. Subscribers are charged an installation fee of $49.50 and a monthly fee of $22.50, which covers programming and system rental and repairs. Chartwell's programs carry no advertising, and its sole source of operating income is from its subscription fees.
 
 
 3
 Chartwell's intent is that its programs be received only by paying subscribers. To ensure that its programming will only be received by its intended audience, Chartwell uses a Blonder-Tongue encoder-decoder system, installed at WXON-TV's transmitter, to encode the transmissions. The video and audio portions of the signal are encoded separately. The video portion of the signal transmitted over Channel 20's assigned frequency is "scrambled," so that a television set tuned to Channel 20 receives the signal but the image is unintelligible. The audio portion of the signal is transmitted via a separate sub-carrier frequency which cannot be received on a commercially available television or radio. Chartwell's subscribers are provided with decoders to enable them to receive the audio and unscramble the video. The decoders are leased to subscribers by Chartwell as part of the system rental. Chartwell is forbidden to sell decoders to subscribers by FCC regulations. 47 C.F.R. § 73.642(f)(3). Without the use of a decoder, a television set tuned to Channel 20 during the hours of ON-TV's operation will receive no audio and unintelligible video.
 
 
 4
 Chartwell began operating in Michigan in June, 1979. In May, 1980 the appellees, Moser and Westbrook, began to make available to the public electronic decoders that would enable persons to receive Chartwell's programming without paying the subscription fees. On July 8, 1980, Chartwell filed this action seeking to enjoin appellees from selling equipment that would enable nonsubscribers to receive Chartwell's programs. Chartwell based its claim on an implied right of action under Section 605 of the Communications Act.[1] A number of claims based on state law were joined to the federal claim, Chartwell asserting pendent jurisdiction.
 
 
 5
 On July 8, 1980 a temporary restraining order was issued which prevented appellees from selling or distributing decoders. Appellees filed a motion to dismiss, contending that Section 605 did not provide a private cause of action, that a private cause of action could not be implied under the four part test of Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and that, in any case, they had not violated the statute. On August 14, 1980 the district court dismissed the complaint on the ground that a private right of action could not be implied for Chartwell under Section 605. Chartwell's request for an injunction pending appeal was denied by the district court. On August 15, 1980 Judge Kennedy of this court, acting as a single circuit judge pursuant to Fed.R.App.P. 8(a), granted Chartwell an injunction pending review by the court. On September 15, 1980 a panel of this court continued the injunction until final determination of the merits of this appeal.
 
 
 6
 We are called upon by Chartwell to decide two questions. First, does Section 605 give Chartwell a private right of action to enjoin the appellees from selling decoders? Second, assuming Chartwell does have a cause of action, is Chartwell entitled to a continuance of the preliminary injunction until the merits of the case are determined?
 
 
 7
 We think that before we can consider whether an implied remedy exists for Chartwell under Section 605, we must resolve two threshold questions. The first question is whether the proviso in the last sentence of Section 605 applies to Chartwell's method of operation. It provides that the protections of the statute shall not apply to "broadcasting" for "the use of the general public." If Chartwell is "broadcasting" for "the use of the general public" then, by definition, it is not protected by Section 605. The second question is, even if Chartwell is not so "broadcasting," does the appellees' activity in fact violate Section 605. If, despite the fact that Chartwell is not "broadcasting," appellees have not violated Section 605, Chartwell has no cause of action.[2]
 
 
 8
 Section 605 protects radio communications, (which include television communications, see, Allen B. DuMont Laboratories v. Carrol, 184 F.2d 153 (3rd Cir. 1950), cert. denied, 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951)) from unauthorized reception, interception, divulgence, publication, etc. However, radio communications broadcast for the use of the general public are not protected. The relevant portion of Section 605 provides:
 
 
 9
 No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto... This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public, or which relates to ships in distress.
 
 
 10
 "Broadcasting" is defined in 47 U.S.C. § 153 as follows:
 
 
 11
 (o) "Broadcasting" means the dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations.
 
 
 12
 The specific question for determination here is whether over-the-air subscription television (STV) is broadcasting for the purposes of Section 605. Subscription radio and television have been in existence for over 30 years, but their widespread availability to residential consumers is a relatively recent phenomenon. There has been very little litigation on the question of unauthorized reception of subscription television signals and the remedies, if any, available to the subscription television services.
 
 
 13
 The leading case on the distinction between communication that is broadcasting and communication that is not broadcasting, and the starting point of our analysis, is Functional Music, Inc., v. F.C.C., 274 F.2d 543 (D.C.Cir.1958). Functional Music was an FM radio station that provided a background music subscription service to commercial establishments. Subscribers received only the music portion of the station's regular FM broadcasts. Special equipment was installed in each subscriber's establishment that deleted all advertising material. An electronic signal was transmitted immediately prior to and after each commercial that turned off and then reactivated the specially equipped receivers. This type of FM transmission is known as simplex transmission.
 
 
 14
 The FCC determined in 1955 that background music subscription services provided by FM radio stations were not broadcasting, within the meaning of 47 U.S.C. § 153(o ), and therefore were not properly transmittable by stations licensed to provide a broadcasting service. The FCC established a rule that relegated subscription background music programs to an FM sub-carrier frequency on a multiplex transmission system an electronic system that allows transmission of multiple signals on a standard allocated FM channel. Functional Music brought an action challenging the FCC's ruling that the subscription service it was providing on a simplex basis (i. e. an FM program that can be received by anyone but with commercials deleted for subscribers) was not broadcasting.
 
 
 15
 The Commission's determination that background music was not broadcasting was based primarily on the content of the programming. According to the Commission the presentation of a highly specialized program format, deletion of advertising from subscribers' receivers and the charging of a fee for these services compelled the conclusion that background music programs constituted point-to-point communication. The Court of Appeals overruled the FCC's determination, noting that the critical factor in determining whether a particular activity is broadcasting is not the specialized content of the programming, but whether the programming is intended for the general public. The court found it clear that Functional Music intended its programs for the general public. The programs carried advertising, were of interest to a large segment of the public and, most importantly, were transmitted over a regular FM channel for the use of whoever cared to listen. As that court stated, "broadcasting remains broadcasting even though a segment of those capable of receiving the broadcast signal are equipped to delete a portion of that signal." Id. at 548.
 
 
 16
 The first case to deal with the question whether radio communication was broadcasting for purposes of Section 605 was KMLA Broadcast Corp. v. Twentieth Century Cig. Vend. Corp., 264 F.Supp. 35 (C.D.Cal.1967). KMLA provided a background music program to commercial subscribers on a multiplex sub-carrier frequency. Unlike the simplex transmissions involved in Functional Music, the multiplex transmissions could not be picked up on commercially sold radios. KMLA provided subscribers with special equipment that enabled them to receive the background music program.
 
 
 17
 The defendant in the KMLA case also offered a background music service to commercial establishments. However, the defendant did not produce or transmit any programs. It simply provided the special equipment necessary to receive the multiplex transmissions of KMLA (and other FM radio stations in the Los Angeles area that were multiplexing) to establishments that allowed it to place cigarette vending machines on the premises. KMLA brought an action for an injunction under Section 605.
 
 
 18
 The court, relying in part on Functional Music, agreed with the FCC's determination that multiplex subscription services were not broadcasting, but were point-to-point communications protected by Section 605. Again, the critical factor for the court was the intent of the station providing the service.
 
 
 19
 The question of whether KMLA's multiplex transmissions over its subcarrier frequency constitute "broadcasting" so as to make the protections of Section 605 inapplicable because of the proviso, supra, hinges on whether KMLA intended a dissemination of its multiplex radio communications to the general public.
 
 
 20
 KMLA, supra at 40. The court found, primarily on the basis of the fact that no one could receive the programming without special equipment, that the station did not intend these programs for the use of the general public. Therefore the transmission was not "broadcasting" and was protected by Section 605. Chartwell argues that in the present case we should follow KMLA as well as Home Box Office v. Pay TV of Greater New York, 467 F.Supp. 525 (E.D.N.Y.1979), a recent case that held the unauthorized reception of HBO's programs, transmitted by MDS signal,[3] by former HBO affiliates was a violation of Section 605.
 
 
 21
 Appellees argue that we should follow the decisions in Orth-O-Vision v. Home Box Office, 474 F.Supp. 672 (S.D.N.Y.1979) and National Subscription Television v. S & H TV, No. CV 80-829-LTL (C.D.Cal. Aug. 4, 1980) (hereinafter NST ). The first of these cases involved MDS transmissions and the second involved, as here, STV transmissions. Both cases held that the subscription television programs in question were broadcasting and within the proviso to Section 605. Therefore, Section 605 provided no protection for the unauthorized interception of the subscription programs. Both courts' decisions rested primarily on the fact that the subscription programs were intended to appeal to a mass audience and were available to anyone wishing to pay the fees.
 
 
 22
 In both cases the courts relied heavily on the determination by the FCC that over-the-air subscription television is broadcasting within the meaning of 47 U.S.C. § 153(o ). The FCC's determination of this question was not, however, made in the context of deciding whether the protections of Section 605 applied to STV. Rather, the determination was made in the context of deciding whether STV should be authorized on a permanent basis nationwide, and whether the FCC had the power to authorize and regulate STV. Chartwell argues that the NST and Orth-O-Vision courts' reliance on the FCC's determination that STV is broadcasting is misplaced, given the context of the determination.
 
 
 23
 In Further Notice of Proposed Rulemaking and Notice of Inquiry, 3 FCC 2d 1, 8-11 (1966) the FCC stated its opinion that STV was broadcasting. This decision was made in response to arguments from the major television networks that STV was not broadcasting. They argued that the Communications Act prohibited the FCC from authorizing a television service on channels assigned to television broadcasting that would be available only to members of the public willing to pay a fee. The FCC concluded that the primary touchstone of a broadcast service is the intent of the broadcaster to provide service without discrimination to as many members of the general public as can be interested in the particular program. On this basis the FCC concluded that STV should be considered broadcasting. This view was reconfirmed in the FCC's Fourth Order and Report, 15 FCC 2d 446, 472 (1968).
 
 
 24
 The FCC has not ruled specifically on the question whether STV is to be considered "broadcasting" for the purposes of Section 605. We do not read the FCC's pronouncements on this matter to foreclose a determination that STV is protected by Section 605. Furthermore, even if the FCC's determination could be interpreted as a ruling that STV is broadcasting for Section 605 purposes, we are not bound by the agency's interpretation. See, Functional Music, supra (court overruled FCC's determination that simplex subscription music program was not broadcasting).
 
 
 25
 Chartwell further argues that the NST and Orth-O-Vision courts incorrectly interpreted the proviso to Section 605. In neither case did the court find the programs were "broadcast ... for the use of the general public." The courts simply decided the programs were broadcasting because the program content had mass appeal and could potentially be received by large numbers of the public. "The crucial consideration is whether the programming is of interest to a large segment of the population." NST, slip op. at 4.
 
 
 26
 We think there is an important distinction between making a service available to the general public and intending a program for the use of the general public. The whole point of STV is to provide the service to as many members of the public as are interested. If the services could not be widely distributed there would be no business. However, the dual nature of STV is that while it may be available to the general public, it is intended for the exclusive use of paying subscribers. Availability and use are separate concepts. The subscription service in KMLA was available to anyone who wanted it, but it was intended only for paying subscribers and was, therefore, not broadcasting.
 
 
 27
 A recent staff report of the FCC's Office of Plans and Policy entitled "Policies for Regulation of Direct Broadcast Satellites" questions the wisdom of the FCC's classification of STV as broadcasting, at least for Section 605 purposes. At page 124, fn. 17 the report states:
 
 
 28
 Based upon its recognition of their "point-to-point" service characteristics, the Commission has concluded that FM radio and MDS subscription programming services are within the purview of Section 605.... It also seems clear that there is no distinguishing factor that would justify the exclusion of STV programming, but not the subscription programming transmitted by other licensees, from the protection afforded by Section 605. For example, it is apparent that the content of FM subscription radio transmissions is not more "private" than STV transmissions and is not for that reason more entitled to Section 605 protection. Although many types of subscription radio services are highly specialized, they are not inherently confidential in nature. Indeed, as one court has noted, Section 605 was intended to protect persons from having their communications received by those not entitled to receive them, and STV operators can only operate their businesses if they can restrict viewers to paying subscribers. (citations omitted).
 
 
 29
 Although this is not the official position of the FCC we find it persuasive. For purposes of the proviso to Section 605 the crucial factor in determining whether programming is broadcasting is whether it is intended for the use of the general public. Functional Music. Although program content is a factor to be considered in making the determination, it is not dispositive. Mass appeal and mass availability are factors which weigh in favor of finding that a particular activity is broadcasting. However, those factors may be negated by clear, objective evidence that the programming is not intended for the use of the general public. Cf., Orth-O-Vision at 682. The fact that STV is transmitted in such a manner that the signal is meaningless without the use of special equipment negates a finding that STV is intended for the use of the general public.
 
 
 30
 We think STV is not broadcasting intended for use by the general public within the meaning of the proviso to Section 605. There is no meaningful distinction between the communications at issue in KMLA and those at issue here. We disagree with the conclusions reached by the courts in Orth-O-Vision[4] and NST, and hold that Chartwell's communications are protected by Section 605.
 
 
 31
 Having determined that Chartwell's communications are protected by Section 605, we now must determine whether the appellees' activity violates the statute. We think it clearly does. It is clear that by selling decoders or decoder schematics the appellees are assisting third parties in receiving communications to which they are not entitled. Appellees' argument that they are not assisting anyone in receiving the signals but are just helping people clarify what they have already received is not persuasive. National Subscription Television v. S & H TV, No. CV 80-829-LTL (C.D.Cal. Aug. 4, 1980), a case relied upon by the appellees for the proposition that STV is unprotected broadcasting, involved a factual situation identical to the present case: an over-the-air subscription television service sought to enjoin individuals from selling decoders to the public. The court there was of the opinion that the sale of unauthorized decoders was a clear violation of the act. NST slip op. at 3. The activity here is identical to that in NST and indistinguishable from that in KMLA Broadcast. Appellees' activity plainly comes within the strictures of Section 605.
 
 
 32
 We now address the question whether a private right of action may be implied from Section 605 under the four part test of Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which provides:
 
 
 33
 (1) Does the statute create a federal right in favor of the plaintiff?
 
 
 34
 (2) Is there any indication of legislative intent to create or deny a private remedy?
 
 
 35
 (3) Is a private remedy consistent with the underlying purpose of the legislation?
 
 
 36
 (4) Is the cause of action one traditionally relegated to state law?
 
 
 37
 Under this test it is fairly clear that Chartwell has a private right of action. Section 605 protects those who communicate by radio from having their communications received, intercepted or divulged by other persons. This creates a federal right in favor of Chartwell. The legislative history is silent on the question of intent to create or deny a private remedy. However, a private remedy is clearly consistent with the underlying purposes of the legislation, which is to protect radio communications. If Section 605 did not confer an implied private cause of action, a party to a communication would have no means of protecting himself from unauthorized interception of the communication. A private remedy is necessary to ensure adequate enforcement of the statute. The cause of action is not one relegated to state law. The regulation of radio and TV has long been an area of federal concern. Finally, there is a long body of precedent finding an implied right of action under Section 605. See, e. g., Reitmeister v. Reitmeister, 162 F.2d 691 (2d Cir. 1947); Pugach v. Dollinger, 277 F.2d 739 (2d Cir. 1960), aff'd per curiam on other grounds, 365 U.S. 458, 81 S.Ct. 650, 5 L.Ed.2d 678 (1961); Guido v. City of Schnectady, 404 F.2d 728 (2d Cir. 1968); KMLA Broadcast, supra; Pay TV of Greater N.Y., supra; NST, supra. We see no reason to deviate from a long established practice with which we agree.[5]
 
 
 38
 The final question to be decided is whether the preliminary injunction should remain in effect until a trial can be had on the merits of Chartwell's claim.[6] We think that it should. There is a substantial likelihood that Chartwell will prevail on the merits. A cause of action exists under Section 605, Chartwell's communications do not come within the proviso to the section and appellees' activity violates the section. Furthermore, Chartwell stands to suffer irreparable harm if appellees are allowed to sell decoders during the pendency of the trial. Once an individual buys a decoder he is lost to Chartwell forever as a potential subscriber. If the injunction does not remain in effect appellees may sell decoders and inflict significant harm on Chartwell's business. Therefore, the preliminary injunction is to remain in effect until final disposition.
 
 
 39
 The order of the district court dismissing Chartwell's claim for failure to state a cause of action is reversed and the case remanded for further proceedings not inconsistent with this opinion.
 
 
 
 *
 Honorable Scott Reed, United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 Section 605, in full, reads as follows:
 Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public, or which relates to ships in distress.
 
 
 [2]
 In adopting the framework for analysis just outlined, we deviate somewhat from the way the parties structured the issues in briefing the case. Since the district court denied the temporary injunction and dismissed the complaint only on the ground that a private cause of action could not be implied from Section 605, this issue, and the attendant discussion of the four part test of Cort v. Ash, was dealt with in its entirety first. Then, assuming that such a cause of action could be implied, and that, therefore, the decision of the district court should be reversed and the case remanded, they addressed the question whether the injunction should be continued. There the parties dealt with the issue whether the activities of the appellees were proscribed by Section 605 and the comparative harm to the parties that would occur from continuing or not continuing the injunction
 We believe that logically it makes better sense at this stage to first deal with the question whether appellees' activities were proscribed and, if so, then deal with the question whether Chartwell has a private cause of action.
 
 
 [3]
 MDS stands for Multipoint Distribution Service. MDS signals are transmitted by a microwave transmitter that sends signals to fixed reception points. The nature of the signal is such that it can only be received by very tall antenna and must be modulated by special equipment for use by conventional television sets. In holding that the unauthorized reception of the signals was a violation of Section 605 the court assumed the MDS transmissions were not "broadcasting."
 
 
 [4]
 The court's conclusion in Orth-O-Vision that HBO's programs are broadcasting and therefore not protected by Section 605 is, in our opinion, severely undercut by the fact that the court granted the full injunctive relief sought by HBO on Copyright Act grounds
 
 
 [5]
 We recognize that recent Supreme Court decisions have undertaken to apply the Cort v. Ash tests in a narrower fashion to limit the number of implied private remedies. In Touche-Ross and Company v. Reddington, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the Court pointed out that during the October, 1978 term it had been asked to decide whether a private remedy is implicit in a statute not expressly providing one no fewer than five times. The Court made the following statement: "Certainly, the mere fact that Section 17(a) was designed to provide protection for brokers' customers does not require the implication of a private damages action in their behalf." Id. at 578, 99 S.Ct. at 2490. The Court went on to comment "to the extent our analysis in today's decision differs from that of the Court in (J. I. Case Co. v. ) Borak, (377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)), it suffices to say that in a series of cases since Borak we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today .... The ultimate question is one of Congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law." Id. Footnote 19 of the opinion says, "we also have found implicit within section 10b of the 1934 Act a private cause of action for damages, see Superintendent of Insurance v. Bankers Life and Cas. Co., 404 U.S. 6, 13 n.9 (92 S.Ct. 165, 169 n.9, 30 L.Ed.2d 128) (1971), but we recently have stated that in Superintendent this Court simply explicitly acquiesced in the 25-year old acceptance by the lower federal courts of an implied action under section 10b."
 Since Reitmeister there has been a consistent and frequent pattern of implying a private cause of action under Section 605 of the Communications Act. We think the Cort v. Ash tests are satisfied here, and are supported in our determination by the long history of implied actions under Section 605.
 
 
 [6]
 In making this determination we rely on the allegations in the verified complaint and the affidavits and depositions that were before the district judge when he dismissed the case on the ground that no cause of action existed under Section 605