**SUBSCRIPTION TELEVISION OF
GREATER WASHINGTON, et
al., Plaintiffs,**

v.

**A. Bart KAUFMANN, d/b/a A.B.
Kaufmann Associates and New
Video Engineering, Defendant.**

Civ. A. No. CA 84–2224.

United States District Court,
District of Columbia.

April 24, 1985.

Robert A. Fietel, Gordon W. Hatheway, Washington, D.C., for plaintiffs.

No attorney of record for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

STANLEY S. HARRIS, District Judge.

### A. *Findings of Fact*

1. Plaintiff Subscription Television of Greater Washington is a general partnership organized and existing under the laws of the District of Columbia, having its principal place of business in McLean, Virginia. The remaining corporate plaintiffs (hereinafter collectively referred to as STV GW) are general partners in that venture.

2. The defendant, A. Bart Kaufmann, is a citizen of the State of New Jersey, trading as A.B. Kaufmann Associates, and/or New Video Engineering, unincorporated business entities whose principal office is (or was) located at Route 527, Box 140, Livingston, New Jersey 07309.

3. The plaintiffs are engaged in the business of providing Subscription Television (STV) program service to Northern Virginia, Southern Maryland, and the District of Columbia under the trade name "Super TV." The plaintiffs provide STV program service by transmission over two ultra high frequency television channels: WNUV, Channel 54, Baltimore, Maryland, and WCQR, Channel 50, Washington, D.C. This programming consists primarily of copyrighted movies, sporting events, and other specialty programming not generally available on advertiser-sponsored commercial television.

4. The plaintiffs commenced STV service on November 1, 1981. To date, they have invested substantial capital in the development of their STV service. Plaintiffs have constructed or purchased two television stations, purchased an inventory of decoders for lease to their customers, and expended substantial sums in acquiring broadcast rights to movies, sporting events, and other programming. Moreover, the plaintiffs have engaged in a large scale advertising campaign to inform the viewing public of the availability of STV broadcast service in the Washington, D.C., metropolitan area. At present, STV GW serves approximately 75,000 fee-paying subscribers.

5. Plaintiffs' STV transmissions are "scrambled" or encoded television signals. The STV broadcast signals are thus unintelligible when received by conventional television sets. In order to view the STV station, one must possess an electronic decoder capable of unscrambling the signal and presenting it in an intelligible form.

6. As part of its service, STV GW generally leases each of its subscribers a specially manufactured decoder box to unscramble the STV signal. Both the decoder and the antenna are connected to the subscriber's television set. The cost of plaintiffs' unrestricted programming (not including one-time only specials) is $29.95 per month. Because there is no commercial advertising on Super TV, virtually all of plaintiffs' revenues come from these monthly subscription fees.

7. The decoder device used by STV GW is manufactured by the Zenith Radio Corporation. The device is encased in a hard black plastic exterior and its approximate dimensions are 11″ by 8″ by 3″. There is a button on top of the decoder which the

subscriber pushes in when he wishes to view the STV program signal. The button is released to return to viewing regular UHF or VHF television signals. The decoder cannot be used for any other purpose other than to unscramble encoded STV broadcast signals.

8. In addition to its capacity to unscramble the STV broadcast signal, the decoder has an "addressability" function which permits STV GW to turn on (or off) the decoder's unscrambling function by its computers. This function would be used, for example, when a subscriber elects voluntarily to terminate service, or when STV GW is forced to turn the descrambler function off for non-payment of the monthly service fee.

9. On or about February 3, 1984, the defendant began to place advertisements in *The Washington Post* and *The Baltimore Sun* which read as follows:

SUPER TV BOX

Assembled. 1 year warranty, consumer oriented company. 1–800–631–3403

10. The foregoing advertisement appeared periodically over the course of several months in both newspapers. The advertisement did not advise potential decoder customers that they were obligated to pay the signal provider, plaintiff STV GW, for the use of the STV service.

11. The advertisement thereafter was amended so as to inform potential customers of the need to notify the signal provider that they would be receiving the signal. The amended version of the defendant's advertisement which appeared in *The Washington Post* on May 8, 1984, read as follows:

SUPER TV BOX

$225. 1 Yr. warranty (must pay fees to cable co.) 1–800–631–3403

12. Both *The Baltimore Sun* and *The Washington Post* ultimately refused to accept any further advertising from the defendant.

13. Defendant Kaufmann then began a saturation direct-mail advertising campaign to residents of Washington, D.C., and the surrounding metropolitan area. The advertisement consisted of a one-page flyer, printed on both sides, which stated in part:

Now you can own your own decoder! That's right! Our Zenith Box is identical to that being used by the Pay T.V. Company. It will enable you to view all phases of Super T.V.—a *$30 monthly service*—for $225 with a one-year unconditional warranty. [Emphasis in original.]

14. The flyer addresses itself as coming from the maker of the finest "T.V. By-Pass Equipment," which is a technical term for the ability to by-pass the addressability feature of the decoding device. The flyer directed potential customers to call the same toll-free number as that which appeared in the earlier newspaper advertisements, but did not inform the reader of the obligation to contact the signal provider.

15. One of the plaintiffs' employees, using a pseudonym, ordered a decoder from the defendant, which was sent from defendant's New Jersey address to plaintiffs' offices in Northern Virginia. When the decoder arrived, the plaintiffs' engineers determined that it was a Zenith decoder of the type leased by STV GW, but that it had been modified so that the addressability feature no longer functioned. The package containing the decoder also included installation instructions, and a small piece of paper which stated in substance that the owner was to contact his local STV signal provider and arrange to make payments for the programming he receives.

16. That paper provides the first and the only notice to the customer (aside from those who purchased after reading the newspaper advertisement which briefly ran as described in paragraph 11) that alludes to any obligation to inform the signal provider that a decoder device is to be used to receive and unscramble the plaintiffs' STV signal.

17. There is only one purpose to be achieved by modifying a decoder device so as to eliminate its addressability function: to enable a user to receive and unscramble

an STV signal without notifying the signal provider. Thus, the defendant is selling a decoder that is no longer compatible with plaintiffs' computer and may not be terminated by its computer. The defendant's "instruction" accompanying the decoder to communicate with the signal provider is therefore worthless.

18. On another occasion, an employee of an affiliated subscription television service called defendant Kaufmann on the pretext of informing him that although he had attempted to make arrangements with the signal provider to pay for the programming, the station had objected to the use of the modified decoders. In response, Kaufmann instructed the customer not to call the station and then stated, contrary to the printed instructions accompanying the decoder, as follows:

You can't do that. You can't do that. You don't want to pay monthly. That's the idea. That's why you spent $225 for the box.

19. Kaufmann's comments demonstrated his specific intent that customers not contact signal providers such as STV GW. Moreover, in that same conversation, Kaufmann also stated that the message was not intended to be followed, but was included only to "protect us" [the defendant].

20. Defendant Kaufmann also stated publicly during a radio interview that he knew his customers were not paying the monthly subscription fee.

21. As a practical matter, the plaintiffs have no means to discover to whom defendant has sold decoders. There is no available technology which would permit the plaintiffs to identify those individuals who are receiving its STV signal through an unauthorized decoder.

22. The defendant Kaufmann has asserted that he was selling from 30 to 40 decoders per week in the Washington metropolitan area. To date, the plaintiffs have never been contacted by any of these purchasers to arrange for payment of the monthly fee.

23. As a result of the defendant's unlawful activities, the plaintiffs have had their services converted and have lost substantial revenue from decoder purchasers who have not paid plaintiff STV GW the monthly viewing fee.

24. On July 19, 1984, STV GW filed a verified complaint for damages and temporary, preliminary, and permanent injunctive relief. STV contemporaneously filed applications moving for such extraordinary relief and a motion seeking expedited discovery.

25. A prompt hearing on plaintiffs' application for a temporary restraining order was delayed, however, because of the need to personally serve the defendant, which was accomplished on August 1, 1984. Although service was made and notice given of the complaint in this case, the defendant defaulted on his obligation to answer the complaint and refused to participate in any of the proceedings.

26. An *ex parte* hearing on plaintiffs' application for a temporary restraining order was held before this Court on August 14, 1984, and two days later the Court entered a temporary restraining order prohibiting the defendant from, *inter alia*, manufacturing or selling the unlawfully modified decoders.

27. In addition, by separate order dated August 15, 1984, the Court granted plaintiffs' motion for expedited discovery, which directed Mr. Kaufmann to appear and be deposed in New Jersey on August 24, 1984. Both written and oral notice of the discovery order was communicated to the defendant.

28. The defendant failed to appear for the deposition and plaintiffs filed a motion for sanctions which was granted in the amount of $880 on September 21, 1984.

29. The Court held an evidentiary hearing on plaintiffs' application for a preliminary injunction on August 29, 1984. The application was granted on September 5, 1984, and by its express terms extended the prohibition against the sale of the modified decoders through the entry of final judgment. The Court's law clerk telephoned the defendant to inform him of the entry of the preliminary injunction and

plaintiffs' counsel independently sent, via certified mail, a copy of the order to the defendant.

30. On September 25, 1984, almost a month after the preliminary injunction was entered, one of plaintiffs' employees, again using a pseudonym, telephoned the defendant's toll free number in New Jersey. The employee spoke with "Bart," who informed her that although his company could no longer ship decoders C.O.D. into the Washington, D.C., area, if she would mail a check for $225 to A.B. Kaufmann at Route 527, Box 140, Livingston, New Jersey, she would receive the decoder within six business days. The decoder was received on October 8, 1984. The mailing carton bore a Cleveland, Ohio, return address, which is the same address as that given by Kaufmann when he advises customers to send decoder devices that have broken down for repairs.

31. A default was entered against defendant Kaufmann by the Clerk of the Court, upon motion, on December 27, 1984.

32. Trial in this case was held on January 24, 1985, at which defendant did not appear personally, through counsel, or otherwise.

33. At trial, plaintiffs introduced competent evidence which established that they had suffered lost sales in the amount of $59,944.50.

### B. *Conclusions of Law*

■ The issue of the defendant's liability in this case is quite straightforward. Section 605 of the Communications Act of 1934, *as amended*, 47 U.S.C. § 605, prohibits any person from assisting in the unauthorized interception of any wireless communication. The statute states, in pertinent part, that:

> No person not being authorized by the sender shall intercept any radio communications and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.... This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is transmitted by any station for the use of the general public.

It is well established that a private civil cause of action exists for violations of Section 605, *Chartwell Communications Group v. Westbrook*, 637 F.2d 459 (6th Cir.1980), and that the statute protects against the unlawful interception of subscription television broadcasting. Without such protection, STV stations would be powerless to prevent the wholesale theft of their signals.

Thus, in *National Subscription Television v. S & H TV*, 644 F.2d 820 (9th Cir.1981), for example, the Court held that it had jurisdiction pursuant to Section 605 to enjoin the unauthorized sale of pirate STV decoders, reasoning that the defendant's activities "threaten the economic viability of the STV industry, and thus run counter to FCC policy and the public interest."[1] 644 F.2d at 825. Similarly, in *Chartwell Communications Group v. Westbrook*, 637 F.2d 459, 466 (6th Cir. 1980), the court held that a private remedy under Section 605 was essential, else the STV signal provider "would have no means of protecting himself from unauthorized interception of the communication."

The evidence adduced in this case clearly establishes that defendant Kaufmann's conduct violated the prohibition contained in Section 605. The defendant has sold,

---

1. At the time *National Subscription Television* was decided, F.C.C. regulations prohibited the sale of decoder devices. *See* 47 C.F.R. § 73.-642(f)(3) (1979). This regulation was subsequently deleted and, although decoders may now be sold, the purchaser still has an obligation to pay for the STV programming service. In deregulating the sale of decoders, the Commission explicitly recognized that its conduct might aggravate video piracy, and endorsed the use of private actions under Section 605 to combat STV piracy. *See Subscription Television Service*, 53 Pike & Fisher, Radio Regulation 646 (1983).

and presumably still is selling, decoders that have been modified so as to render their addressability feature inoperative. There is only one purpose to be achieved by such modification: to enable the user to receive and unscramble a STV signal without notifying and having to make payments to the signal provider.

Moreover, the defendant is selling these decoders with the knowledge and intent that his customers do not contact local STV signal providers to arrange for payment of the programming service. The defendant has acknowledged that he knows his customers are not paying for the programming they receive and, as found above, specifically advised one such client not to contact the signal provider, commenting that: "You don't want to pay monthly.... That's why you spent $225 for the box." Section 605 prohibits any person from assisting in the unauthorized interception of STV signals. *See Chartwell Communications Group v. Westbrook,* 637 F.2d at 466 ("It is clear that by selling decoders or decoder schematics the [defendants] are assisting third parties in receiving communications to which they are not entitled.").[2]

The Court also notes, without deciding, however, that the defendant's conduct appears to constitute a number of common law torts, including theft-of-service and conversion, and appears also to run afoul of several federal criminal statutes, including the prohibition against mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 2511.

■ The only remaining issue is the type of relief which should be granted in this case. Plaintiffs have requested that the Court enter a permanent injunction and an award of both compensatory and punitive damages. The Court turns first to the availability of injunctive relief.

It is well settled that the federal district courts are vested with "broad discretionary power" in the shaping of equitable remedies. *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) (plurality). The traditional basis for injunctive relief is a showing of irreparable harm and the inadequacy of legal remedies. *E.g., Reed Enterprises v. Corcoran,* 354 F.2d 519, 522 (D.C.Cir.1965).[3] This Court also will consider the public interest in the entry of an injunction. *Ashland Oil, Inc. v. Federal Trade Commission,* 409 F.Supp. 297, 307 (D.D.C.1976). *See generally* 11 C. Wright & A. Miller, Federal Practice and Procedure § 2942 (1973). It is clear that the plaintiffs have met the standard for injunctive relief and that a permanent injunction prohibiting the defendant from manufacturing or selling the modified decoders must be entered.

As an initial matter, the defendant's conduct has caused and is continuing to cause plaintiffs irreparable harm. Each purchaser of defendant's pirate decoders is lost to plaintiffs as a potential subscriber to their STV service. Because subscriber fees are virtually plaintiffs' only source of revenue to support their STV business, the irretrievable loss of subscribers constitutes irreparable damage entitling plaintiffs to injunctive relief. *See Chartwell Communications Group v. Westbrook,* 637 F.2d at 467.

In addition, another irreparable injury is being inflicted because plaintiffs' ability to retain existing subscribers, to enlist new

---

**2.** The defendant's extremely modest efforts to notify customers of their legal obligation to contact the signal provider does not absolve him of liability. Neither the defendant's newspaper or direct mail advertisements mention this obligation, nor does the defendant communicate such fact upon receipt of the phone order for the decoder. The small piece of paper included in the package when the decoder device is delivered which informs the customer (after the fact) of his responsibility to contact the signal provider is not intended nor designed to cause such a result. Rather, it is, as defendant also has ad-

mitted, something just "to protect us." Defendant Kaufmann's purported attempt to comply with the letter of the law cannot excuse his total disregard for its spirit and intent.

**3.** This standard is incorporated in the test for the grant of temporary and preliminary injunctive relief set forth by the Court of Appeals in *Washington Metropolitan Area Transit Authority v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C. Cir.1977), and *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958).

subscribers, to acquire suitable programming, and to remain in the STV business depends directly on their reputation as the sole source of the STV programming that plaintiffs provide. Plaintiffs' STV business will not survive if plaintiffs lose their credibility as the exclusive source of their programming.

Moreover, plaintiffs have no adequate remedy at law because money damages cannot make them whole. The federal courts have recognized in other video piracy cases that this injury is not adequately compensated by money damages.

In *Home Box Office, Inc. v. Pay TV of Greater New York, Inc.*, 467 F.Supp. 525, 530 (E.D.N.Y.1979), for example, the court found that:

> Plaintiff plausibly claims that its present lack of control over the locations and customers being served by defendant and defendant's representation of the pirated service as its own are damaging plaintiff's name and jeopardizing its expansion plans. A judgment for damages is hardly adequate to compensate for these.

The public interest also strongly supports the entry of a permanent injunction. The FCC has been authorized by Congress to regulate the airwaves so as to promote the public interest. *See e.g., National Subscription Television v. S & H TV*, 644 F.2d at 826. In furtherance of this mandate, the Commission has authorized and licensed STV service. *See* 47 C.F.R. §§ 73.641–73.644.

The FCC's efforts to authorize, license, regulate and promote STV services so as to serve the public interest would be thwarted if STV programmers are not protected from unlawful activities such as those engaged in by defendant. In fairness to plaintiff, their paying subscribers, and all others who seek to earn their own living and pay their own way in this society, the requested permanent injunction should issue.

This Court is obligated to shape an injunction which will provide protection for the plaintiffs both now and in the future. Thus, the permanent injunction entered in this case will provide not only that the defendant be permanently enjoined from selling or otherwise distributing unauthorized, non-addressable decoders. In addition, the terms of the injunction will order the defendant to turn over his customer lists to the plaintiffs so that they may contact the purchasers and make arrangements for payment. Finally, in order to ensure that the defendant does not continue the unlawful sale of the modification decoders, he will be ordered to turn over the decoders in his possession, wherever located, to the United States Marshal's office having jurisdiction over the district in which they are located, for ultimate destruction.

■ With respect to the issue of damages, at trial plaintiffs established that they were entitled to $59,944.50 in compensatory damages. In the special circumstances of this case, however, more than the entry of an award of compensatory damages is necessary to vindicate both the private and public interests raised in this litigation. The plaintiffs have requested, and the Court concludes that the defendant's conduct warrants, the imposition of a punitive damages award.

■ In this jurisdiction punitive damages are awarded, in addition to compensatory damages, both to punish the wrongdoer and to deter him (and others) from similar misconduct in the future. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266–67, 101 S.Ct. 2748, 2759–60, 69 L.Ed.2d 616 (1981). Punitive damages are justified when the defendant acts with "gross fraud, wantoness, maliciousness, or willful disregard" for the rights of others. *Rainbolt v. Johnson*, 669 F.2d 767, 769 (D.C.Cir.1981). *Accord Knippen v. Ford Motor Co.*, 546 F.2d 993, 1002 (D.C.Cir. 1976). Moreover, the trier of fact may infer the requisite mental state from the defendant's conduct. *See Hobson v. Wilson*, 556 F.Supp. 1157, 1193 (D.D.C.1982). The award of punitive damages, of course, rests within the sound discretion of the trial court sitting in a non-jury case. *Mariner Water Renaturalizer v. Aqua Purifi-*

*cation Systems, Inc.,* 665 F.2d 1066, 1071 (D.C.Cir.1981).

In this case, the Court finds that the defendant's continuing course of misconduct unmistakably manifests his wanton, willful and total disregard for the rights of others. The testimony introduced at the trial shows that the defendant has not only violated the law by selling the modified decoders but has deliberately ignored the express terms of this Court's preliminary injunction, and also has attempted to avoid detection by mailing the unlawful modified decoders from another site and by refusing to accept C.O.D. orders from the Washington, D.C., area.

A substantial award of punitive damages is consistent with the purposes of that remedy. It will serve both to punish the defendant and to deter similar conduct in the future. *See Davis v. Schuchat,* 510 F.2d 731, 738 (D.C.Cir.1975) (civil law has long recognized that in certain situations deterrence can be better achieved by punitive damages award than through criminal sanctions). Accordingly, the Court will enter an order awarding plaintiffs $50,000 in punitive damages.

As noted above, the defendant has contumaciously ignored, disregarded, or intentionally disobeyed the directives of this Court, including the temporary restraining order and the preliminary injunction. In the future, the Court will consider with the utmost severity any failure by the defendant to comply with each provision of the Court's permanent injunction which is issued contemporaneously herewith.

## ORDER

Upon consideration of plaintiffs' application for a permanent injunction, compensatory and punitive damages, the memorandum in support thereof, and the evidence and the argument of counsel presented thereon at trial on January 27, 1985, at which the defendant did not appear in person, or by counsel, and for the reasons set forth in the Court's Findings of Fact and Conclusions of Law issued this date, pursuant to Fed.R.Civ.P. 52, it hereby is

ORDERED, that plaintiffs' application for a permanent injunction is granted. It hereby further is

ORDERED, that the defendant A. Bart Kaufmann, A.B. Kaufmann Associates, New Video, and any and all other persons acting in consort or participation, aiding and abetting, or conspiring with him hereby are permanently enjoined from:

(1) Manufacturing, assembling, purchasing, using, installing, advertising, promoting, selling, renting, consigning, leasing, gifting, distributing, conveying, or transferring; or attempting to manufacture, assemble, purchase, use, install, advertise, promote, sell, rent, consign, lease, gift, distribute, convey or transfer, components, plans, or devices capable of, or intended, designed, or represented to be capable of, intercepting or receiving plaintiffs' subscription television programming which has had the manufacturer-installed addressability function removed or modified so as to render it inoperative.

(2) Assisting, aiding and abetting, or conspiring with any person or entity, to unlawfully intercept, receive, publish, divulge, use, or benefit from plaintiffs' subscription television programming without authorization from plaintiffs.

(3) Destroying, altering, concealing, secreting, changing, disposing of, or tampering in any way with, or otherwise making unavailable, records or writing of any sort which refer to, relate to, mention, or memorialize any acts or transactions of the nature described in the foregoing numbered paragraphs including, without limitation, books of accounts or accounting records, memoranda, or lists of, or documents which identify actual or potential manufacturers, suppliers, purchasers, or transferees of components, plans, or devices.

(4) Disposing of, concealing, removing, or otherwise making unavailable the pro-

ceeds of any sales, rentals, consignments, leases or other conveyances of components, plans, or devices of the nature described in the foregoing numbered paragraphs. It hereby further is

ORDERED, that within ten days from the date of this Order, defendant shall make available to the plaintiffs a list of the names and addresses of any individual to whom he has sold a decoder device. It hereby further is

ORDERED, that within ten days from the date of this Order, defendant shall turn over all decoders modified so as to render their addressability feature inoperative to the United States Marshal's Service in the jurisdictions where such decoders are located. It hereby further is

ORDERED, that plaintiffs shall be awarded compensatory damages in the amount of $59,944.50. It hereby further is

ORDERED, that pursuant to Fed.R. Civ.P. 37 plaintiffs shall be awarded damages as a sanction against the defendant in the amount of $880. It hereby further is

ORDERED, that plaintiffs shall be awarded punitive damages in the amount of $50,000. It hereby further is

ORDERED, that plaintiffs' bond shall be released.

The Clerk shall enter judgment in the total amount of $110,824.50 in favor of the plaintiffs against the defendant, and the case is dismissed.

SO ORDERED.