**ON/TV OF CHICAGO,**
Plaintiff-Appellee,

v.

**Archie Ward JULIEN,**
Defendant-Appellant.

**No. 84–1908.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 23, 1985.

Decided May 31, 1985.

Rehearing and Rehearing En Banc
Denied July 15, 1985.

Archie Ward Julien, pro se.

Marureen P. McIntyre, Henehan & McIntyre, Cary, Ill., for plaintiff-appellee.

Before COFFEY, FLAUM, Circuit Judges, and JAMESON, Senior District Judge.*

COFFEY, Circuit Judge.

The defendant appeals the grant of a preliminary injunction preventing him from selling "decoder kits" capable of unscrambling the plaintiff's subscription television signal. We affirm.

* The Honorable William J. Jameson, Senior District Judge for the District of Montana, is sitting by designation.

I.

The plaintiff ON/TV of Chicago ("ON/TV"), an Illinois joint venture, produces, promotes and transmits subscription television services over UHF channels in Chicago. To ensure that ON/TV programming will be received only by subscribers, ON/TV transmits an encoded or scrambled signal that is incapable of reception by an ordinary television set. Reception adequate for viewing is obtained only by television sets equipped with special decoding devices leased by ON/TV to its subscribers on a monthly basis. The defendant, Archie Ward Julien, doing business as LSR Engineering and as Julien and Reed Electronics, sold kits containing electronic parts and detailed instructions for assembling the parts into unauthorized or "pirate" ON/TV decoders. The defendant included in the kit a "Disclaimer of all Liability, Description and Limited Warranty." The Disclaimer of all Liability and Description provided:

"These plans are intended for use conforming to current laws and regulations only. Since these plans may be used to construct a device for receiving subscription television, the F.C.C. recommends disclosure that Section 605 of the 1934 Communications Act (as well as certain law in the State of Illinois: see part of S.B. 1387, Amended, enclosed), may require the hobbyist to obtain the prior permission from the broadcaster. Furthermore, the broadcaster may have filed a waiver to Section 605 in applying for a broadcast license. Also, video taping from such a device may be legally restricted. The hobbyist is subject to, and agrees to compliance with applicable government regulations. ANY VIOLATION THEREOF IS IN DIRECT CONTRAVENTION OF THE INTENDED USE OF THESE PLANS, AND IS STRICTLY PROHIBITED BY LSR ENGINEERING.

"Any plans are relevant to only one system, and may be completely incompatible with any other system. Since the listing of different systems on the last page is second-hand information, it is the HOBBYIST'S RESPONSIBILITY to determine the type of system actually being used in any particular case. A device built from Sine Wave System plans will not operate in the desired manner if receiving a channel using the Gated Pulse System. (Sine Wave System plans will not work for channel 66 in Chicago.) Obviously, LSR cannot control the broadcaster. Any listing given of a station using any particular system, e.g., the Sine Wave System for channels 44 and 60 in Chicago, is merely meant to be a helpful hint to facilitate the hobbyist in illustrating the transmission principles involved. Therefore, although LSR stronglyest [sic] encourages hobbyists to take out a regular subscription from the broadcaster (to avoid any semblance of impropriety on anybody's part), the list should not be construed as an implication that the broadcaster will grant permission or continue using the system indefinitely. Again, it is the responsibility of the hobbyist to confirm the actual system being used, and to be able to evaluate the usefulness of these plans as it pertains to its individual circumstances."

In January of 1983, an investigator working for ON/TV responded to an advertisement in *Tradin' Times* for a "DLX, Sign Wave, UHF Converter by LSR Engineering" by telephoning a number listed in the advertisement. The unidentified male who answered the call stated that he had ON/TV decoder kits for sale but that the purchase price, $175.00, must be paid in cash. The investigator arranged to meet the man at his home to purchase an ON/TV decoder. Upon arriving at the apartment, 3801 W. Addison, Chicago, Illinois, the investigator was greeted by a man identifying himself as Archie, who sold the investigator an ON/TV decoder kit.

On September 23, 1983, a second investigator hired by ON/TV responded to a newspaper advertisement for a TV decoder that "picks up all movies and sports and is easy to build and connect," by telephoning a number listed in the advertisement. The telephone number was registered to Archie Ward Julien. The investigator requested information pertaining to ON/TV decoders and the unidentified male who answered directed the investigator to a store, Julien and Reed Electronics, located at 3806 W. Lawrence, Chicago, Illinois. At the store, the investigator observed signs in the store windows listing television channels, including ON/TV, and prices of decoder kits. Upon entering the store, the investigator informed the sales clerk that he had talked to someone on the phone earlier in the day regarding ON/TV decoders and asked the clerk whether he had any for sale. The clerk responded affirmatively and described various kits to the investigator including a model that would allow the purchaser to view Spectrum, Sports Vision and ON/TV. While in the store, the investigator noted several signs stating that payments were on a cash basis and that there were no exchanges or refunds. The investigator purchased a kit described by the sales clerk as an "ON/TV kit."

On March 26, 1984, a plain clothes police officer and a third investigator working for ON/TV visited Julien and Reed Electronics. Upon entering the store, the two men spoke with the sales clerk who told them that he had a decoder kit for sale capable of decoding the ON/TV signal. The clerk further informed the men that "ON/TV was going to jam the signal but if the kit was jammed, he had an add-on kit that would overcome the jamming." The men purchased an ON/TV decoder kit and left the store.

The plaintiff filed suit in the district court for the Northern District of Illinois alleging violations of the Federal Communications Act, the Racketeer Influenced and Corrupt Organizations Act, the Lanham Act, and the Omnibus Crime Control and Safe Streets Act; copyright infringement; and pendent states claims of unfair competition, conversion and violation of the Illinois Consumer and Deceptive Businesses

Practices Act. After a hearing on the plaintiff's motion, the court granted a preliminary injunction barring Archie Ward Julien from selling ON/TV decoder kits.

## II.

◼ The defendant in this case contends that the district court erred in granting a preliminary injunction. To obtain a preliminary injunction, a plaintiff must show: (1) that he has no adequate remedy at law or will suffer irreparable harm if the injunction is denied; (2) that the harm he will suffer is greater than the harm the defendant will suffer if the injunction is granted; (3) that the plaintiff has a reasonable likelihood of success on the merits; and (4) that the injunction will not harm the public interest. *Palmer v. City of Chicago*, 755 F.2d 560, 576 (7th Cir.1985). Grants of preliminary injunctions are reviewed under the abuse of discretion standard. *Doran v. Salem, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975). Julien questions only the likelihood of the plaintiff's success on the merits arguing that because he included the "Disclaimer of All Liability" with the decoder kit instructions, § 605 of the Federal Communications Act (47 U.S.C. § 605) and the Copyright Act do not provide the plaintiff with causes of action supporting injunctive relief.

◼ Section 605 of the Federal Communication Act, 47 U.S.C. § 605 (West Supp. 1984) provides in pertinent part: "No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto ..." The statute further provides, however, that its prohibitions "shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is transmitted by any station for the use of the general public..." *Id.* "Radio communication" as defined in § 153(b) of the Act has been construed to include television transmissions. *Allen B. DuMont Laboratories v. Carroll*, 184 F.2d 153 (3d Cir.1950), *cert. denied*, 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951). Although Congress' purpose in passing the Communications Act was to regulate the communications industry, courts have long recognized a private right of action under § 605. *E.g., Movie Systems, Inc. v. Heller*, 710 F.2d 492 (8th Cir.1983); *National Subscription Television v. S & H TV*, 644 F.2d 820 (9th Cir.1981); *Chartwell Communications Group v. Westbrook*, 637 F.2d 459 (6th Cir.1980); *Reitmeister v. Reitmeister*, 162 F.2d 691 (2nd Cir.1947).

◼ Addressing the argument that § 605 does not apply to subscription television because of the broadcasting "for the use of the general public" exemption, courts have held that the crucial factor in determining whether programming is broadcast for the use of the general public "is not whether the content of the programming has mass appeal or mass availability but rather, whether it was *intended for the use of the general public.*" *Movie Systems*, 710 F.2d at 494 (emphasis in original); *Chartwell Communications*, 637 F.2d at 465; *National Subscription Television*, 644 F.2d at 823–25.

"We think there is an important distinction between making a service available to the general public and intending a program for the use of the general public. The whole point of STV [subscription television] is to provide the service to as many members of the public as are interested. If the services could not be widely distributed there would be no business. However, the dual nature of all STV is that while it may be available to the general public, it is intended for the exclusive use of the paying subscribers. Availability and use are separate concepts. The subscription service in KMLA [*Broadcasting Corp. v. 20th Century Cig. Ven. Corp.*, 264 F.Supp. 35 (C.D.Cal.1967)] was available to anyone who wanted it, but it was intended only for paying subscribers and was, therefore, not broadcasting [for the use of the general public]."

*Chartwell Communications,* 637 F.2d at 465. Thus, courts have concluded that although the content of subscription television programming may be of interest to the general public, the scrambled transmissions are intended only for the benefit of the paid-up subscribers. Because subscription television programming is intended for the benefit of paying subscribers only, it does not fall within the "broadcasting for the use of the general public" exception to § 605. Section 605, therefore, prohibits unauthorized interception of the scrambled signal. *Movie Systems,* 710 F.2d at 495; *National Subscription Television,* 644 F.2d at 823–25; *Chartwell Communications,* 637 F.2d at 465–66.

Citing a case analyzing intent in a wire fraud case, *United States v. Conte,* 349 F.2d 304 (6th Cir.1965), and a contributory copyright infringement case, *Sony Corp. v. Universal City Studios,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), the defendant argues that because he included a disclaimer of liability in the decoder kits, he did not intend to violate § 605. Section 501 of the Act provides in pertinent part: "Any person who willfully and knowingly does or causes or suffers to be done any act ... in this chapter prohibited or declared to be unlawful ... shall, upon conviction thereof, be punished for such offense, for which no penalty (other than a forfeiture) is provided in this chapter, by a fine of not more than $10,000 or by imprisonment for a term not exceeding one year, or both ..." By arguing that he lacked the requisite intent, Julien raises the issue of whether § 501 applies to private civil actions under § 605 for assisting a third party in intercepting protected communications.

The defendant has not directed us to any case law, and our research fails to reveal a civil action under § 605 for assist-

ing the unauthorized interception of protected communications, in which a court based its determination of liability upon the intent of the defendant.[1] Julien analogizes a civil action for assisting the unauthorized interception of protected communications to the doctrine of contributory liability for copyright infringement. According to Julien, a person does not assist an unauthorized interception of a protected communication if the device he sells has a substantial non-interception use and the defendant did not actively encourage the unauthorized interception. Sales of devices solely designed to intercept protected communications threaten the viability of the subscription television industry and there is no countervailing social or policy consideration that would justify these sales. *Home Box Office v. Advanced Consumer Technology,* 549 F.Supp. 14, 25 (S.D.N.Y.1981). However, whether the sole purpose of the decoder sold by Julien was to intercept privileged communications is a question of fact, to be resolved at trial. The defendant cannot avoid the imposition of a preliminary injunction merely by alleging that the device he sold had a substantial non-interception use. Furthermore, the doctrine of contributory liability for copyright infringement developed because the Copyright Act does not expressly render anyone liable for an infringement committed by another. *See Sony Corp. v. Universal City Studios,* 464 U.S. 417, 104 S.Ct. 774, 785, 78 L.Ed.2d 574 (1984) (copyright infringement action against manufacturers of home videotape recorders). Because § 605 expressly prohibits "assisting third parties in receiving communications to which they are not entitled," *Chartwell Communications,* 637 F.2d at 466, we see no need to introduce concepts of vicarious liability into § 605 actions. Since sale of a decoder obviously "assist[s] in receiving any interstate or for-

---

1. The court to acknowledge the issue of whether § 501 applies to private civil suits under § 605 for assisting third parties in intercepting protected communications hypothesized in dicta that if courts did not apply § 501, devices that were *not* manufactured for the sole purpose of pirating scrambled subscription television signals might fall under § 605. *Home Box Office*

*v. Advanced Consumer Technology,* 549 F.Supp. 14, 25 (S.D.N.Y.1981). The court gave an example of a situation raising the issue the potential civil liability of a manufacturer selling a television capable of receiving signals on frequencies now reserved for Multi-Point Distribution Services (subscription television utilizing a microwave signal).

eign communication by radio and [the] use [of] such communication ... for the benefit of another not entitled thereto ..." as prohibited by § 605, we hold that ON/TV is not required to establish that Julien intended to violate § 605 by actively encouraging the unauthorized interception of their signals.

■ Additionally, even if we were to accept the defendant's argument that § 501 applies to private civil suits under § 605 for assisting in the unauthorized interception of protected communications, an examination of the facts in this case reveals that the ultimate trier of fact could easily find that Julien willfully and knowingly assisted the unauthorized interception of protected communications. The Supreme Court has defined "willful" in the context of a civil statute as conduct showing "disregard for the governing statute and an indifference for its requirements." *TransWorld Airlines, Inc. v. Thurston,* —— U.S. ——, 105 S.Ct. 613, 625, 83 L.Ed.2d 523 (1985). The evidence presented by the plaintiff with its motion for a preliminary injunction reveals that the defendant was actively engaged in assisting non-subscribers in the unauthorized reception of ON/TV broadcasts. The defendant's advertisement boasted that the decoder was capable of "pick[ing] up all the movies and sports." The signs in the windows of Julien and Reed Electronics listed subscription television channels and the cost of decoder kits capable of receiving the channels. Unlike normal business practices, the sales were on a cash only, no return basis. One sign specifically stated that the particular model would allow the purchaser to view Spectrum, Sports Vision and ON/TV. The sales clerk's assurance that he could supply an add-on kit if ON/TV "jammed" its signal and the "disclaimer" enclosed with each decoder warning the purchaser that he should determine whether the kit would decode the channel he wished to view clearly establishes from our vantage point that the kits were intended to be used as unauthorized "pirate" decoders. Whatever the attempted legal effect of the defendant's disclaimer, the ultimate trier of fact could easily find that it was a transparent attempt to deny the patent illegality of the defendant's acts; in light of the overwhelming evidence that the defendant knowingly sold the decoder kits for the sole purpose of intercepting ON/TV's broadcast, the credibility of the disclaimer is doubtful.

■ Because the weight of the evidence demonstrating that the defendant assisted others in intercepting broadcasts protected by § 605 is not offset or in any way diminished by the disclaimer, we hold that the plaintiff has established that it is likely to succeed on the merits of its § 605 claim.[2] Moreover, the remaining requirements for granting a preliminary injunction clearly were established in this case. ON/TV collects its revenues by renting decoders to its subscribers. Typically, viewers who purchase pirate decoders do so to evade paying the monthly rental fee to ON/TV. Thus, ON/TV loses a potential customer whenever a pirate decoder is sold. The sale of pirate decoders threatens the viability of the subscription television industry and there is no countervailing social or policy consideration that would justify these sales. We hold that ON/TV would suffer irreparable harm from the lost sales if the injunction were denied; that the harm to ON/TV from the sale of the decoder outweighs the harm to Julien in granting the injunction; and, that enjoining the sale of the pirate decoders would further the public interest by protecting the viability of the subscription television industry.

Accordingly, the district court's order granting the plaintiff's motion for a preliminary injunction is AFFIRMED.

---

**2.** Because district court was justified in issuing the injunction based on the § 605 claim, we need not address the merits of any of the other claims.